720 F.2d 266
 John E. RENNIE
v.
Ann KLEIN, Commissioner of Human Services; Michail Rotov,
Director, Division of Mental Health and Executive Officer of
Ancora Psychiatric Hospital; Max Pepernick, Acting Medical
Director of Ancora Psychiatric Hospital; Edward Wallace,
Assistant Administrator of Ancora Psychiatric Hospital;
Josefina Bugaoan, Assistant Medical Director of Ancora
Psychiatric Hospital.
Appeal of John E. RENNIE, Plaintiff, on behalf of himself
and all others similarly situated, and Caroline Mauger,
Eugenio Burgeos, Leon Rossi, Hazel Moncrief, Ernie Welker,
Mary Jane Weiss, Margaret Mary McGrath, Joseph Kamienski,
Intervenors, on behalf of themselves and all others
similarly situated.
John E. RENNIE
v.
Ann KLEIN, Commissioner of Human Services: Michail Rotov,
Director, Division of Mental Health and Executive Officer of
Ancora Psychiatric Hospital; Max Pepernick, Acting Medical
Director of Ancora Psychiatric Hospital; Edward Wallace,
Assistant Administrator of Ancora Psychiatric Hospital;
Josefina Bugaoan, Assistant Medical Director of Ancora
Psychiatric Hospital.
Appeal of Ann KLEIN and Michail Rotov.
 Nos. 79-2576, 79-2577.
 United States Court of Appeals,
Third Circuit.
 On Remand from the Supreme Court
July 2, 1982.
Decided Oct. 13, 1983.
 
 John J. Degnan, Atty. Gen. of N.J., Stephen Skillman, Asst. Atty. Gen., Steven Wallach, Deputy Atty. Gen., Trenton, N.J., for appellees in 77-2576, cross-appellants in 79-2577.
 Robert Plotkin, Mental Health Law Project, Washington, D.C., for amici curiae, Joseph H. Rodriguez, Public Advocate, Michael L. Perlin, Sp. Counsel to the Public Advocate, Laura M. LeWinn, Acting Director, Div. of Mental Health Advocacy.
 Stanley C. Van Ness, Sheldon Gelman, Dept. of Public Advocate, Trenton, N.J., for appellants in 79-2576, cross-appellees in 79-2577.
 Christopher A. Hansen, Robert M. Levy, Mental Patients' Rights Project, New York Civil Liberties Union, New York City, for amici curiae.
 Joel I. Klein, Ellen S. Silberman, Susan L. Carney, Rogovin, Stern & Huge, Washington, D.C., for amici curiae, American Psychiatric Ass'n.
 Before SEITZ, Chief Judge, and ALDISERT, ADAMS, GIBBONS, HUNTER, WEIS, GARTH, HIGGINBOTHAM, SLOVITER, BECKER, Circuit Judges.
 
 OPINION ANNOUNCING THE JUDGMENT OF THE COURT
 
 1
 GARTH, Circuit Judge, with whom ALDISERT and JAMES HUNTER, III, Circuit Judges, join:
 
 
 2
 John Rennie, the plaintiff in this matter, has been a patient at the Ancora Psychiatric Hospital, a state institution in New Jersey, on numerous occasions since 1973. It was during his twelfth hospitalization, after an involuntary commitment proceeding, that Rennie instituted the suit which gave rise to these proceedings.[1] The issue presented in this appeal involves the constitutional right of involuntarily committed mentally ill patients to refuse antipsychotic drugs administered against their will.[2] The district court recognized a constitutional right to refuse treatment. Rennie v. Klein, 462 F.Supp. 1131 (D.N.J.1978) and 476 F.Supp. 1294 (D.N.J.1979). In doing so, however, the district court framed an injunction in which it embodied those requirements which the court deemed necessary to protect the liberty interest of involuntarily committed mental patients who refuse antipsychotic medication. Both parties appealed from the district court's order granting a preliminary injunction.
 
 I.
 
 3
 On appeal, this court sitting in banc agreed that there existed a constitutional right to refuse treatment. Rennie v. Klein, 653 F.2d 836 (3d Cir.1981) (in banc). Our opinion, while recognizing that "the patient has a constitutional right to be free from treatment that poses substantial risks to his well-being," id. at 844-45, also included in its constitutional standard a "least intrusive means" analysis. See 653 F.2d at 845-47. Thus, the in banc majority affirmed the district court's analysis, see 462 F.Supp. at 1145-48, but then rejected the injunction imposed by that court and modified that injunction to incorporate the provisions of New Jersey's Administrative Bulletin 78-3, which was found to satisfy due process. 653 F.2d at 851.
 
 
 4
 At about the same time that the Rennie proceedings were taking place, we were also called upon to determine the constitutional standards which governed the case of a mentally retarded patient who claimed the right to be free from undue bodily restraint, the right to personal security, the right to protection from attacks by other inmates, and the right to adequate treatment. Romeo v. Youngberg, 644 F.2d 147 (3d Cir.1980) (in banc). Romeo involved a section 1983 action for damages in which the plaintiff claimed that as a mentally retarded inmate of Pennhurst, a state institution, his constitutional rights had been violated when he suffered, among other things, attacks on his person and physical restraints. Convening in banc, we found a Fourteenth Amendment liberty interest in freedom of movement, in personal security, and in habilitation, 644 F.2d at 164-69, but we did not agree on the relevant standard to be used in determining whether plaintiff Romeo's rights had been violated.
 
 
 5
 The Supreme Court vacated the in banc majority judgment in Romeo, and adopted the standard announced by Chief Judge Seitz in his Romeo concurrence. Youngberg v. Romeo, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982). The Supreme Court held that the standard for determining damage recovery for mentally retarded patients against doctors and other professionals turns on whether "the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." Id. at 323, 102 S.Ct. at 2462 (footnote omitted). The Supreme Court thus declined to adopt a "least intrusive means" analysis, and remanded both Rennie, 458 U.S. 1119, 102 S.Ct. 3506, 73 L.Ed.2d 1381 (1982) and Rogers v. Okin, 634 F.2d 650 (1st Cir.1980), cert. granted, 451 U.S. 906, 101 S.Ct. 1972, 68 L.Ed.2d 293 (1981), vacated and remanded sub nom. Mills v. Rogers, 457 U.S. 291, (1982) to their respective courts. Mills involved the same issue as Rennie, namely, the constitutionality of the forcible administration of antipsychotic drugs to involuntarily committed mental patients. Rennie was remanded specifically for reconsideration in light of the Supreme Court's opinion in Youngberg.[3]II.
 
 
 6
 It is against the backdrop of both our Romeo and Rennie in banc decisions and the Supreme Court's opinion in Youngberg v. Romeo that we have been called upon to reconsider our judgment in Rennie v. Klein, 653 F.2d 836 (3d Cir.1981). Having re-examined that opinion and judgment, I believe that the Supreme Court's decision in Youngberg does not require any change in the judgment which accompanied our earlier opinion, even though the analysis leading to that judgment does require amendment. The Supreme Court in Youngberg did not refer to a "least intrusive means" analysis.[4] Thus, if we are to reconsider Rennie in light of the Supreme Court's teaching in Youngberg, we cannot employ the concept of "least intrusive means." In New Jersey, the standard by which Rennie, as a mentally ill patient who has been committed involuntarily to a state institution, see State v. Krol, 68 N.J. 236, 344 A.2d 289 (1975), must have his constitutional right to refuse antipsychotic drugs measured, is whether the patient constitutes a danger to himself or to others.[5] Because that evaluation must be the product of the medical authorities' professional judgment, such a judgment and the resulting decision to administer medication will be presumed valid unless it is shown to be a "substantial departure from accepted professional judgment, practice or standards." Youngberg, 457 U.S. at 323, 102 S.Ct. at 2462. One of the factors to be considered in the exercise of professional judgment--albeit not a controlling or necessarily determinative factor--is whether and to what extent the patient will suffer harmful side effects. I believe that the professional judgment standard established by the Supreme Court in Youngberg sets the limits within which this factor must be assessed.[6]
 
 
 7
 Because the record here is limited to a representative and a class of involuntary committees I, in turn, would restrict the holding in this case to only those mentally ill patients who constitute a danger to themselves or to others.[7] Thus, I would hold only that antipsychotic drugs may be constitutionally administered to an involuntarily committed mentally ill patient whenever, in the exercise of professional judgment, such an action is deemed necessary to prevent the patient from endangering himself or others. Once that determination is made, professional judgment must also be exercised in the resulting decision to administer medication.[8]
 
 III.
 
 8
 The elimination of the concept of "least intrusive means" from this analysis does not, however, require that any change be made in the decree portion of our in banc opinion, which held that New Jersey procedures were adequate in implementing the rights of the mentally ill. Our earlier judgment, even though incorrectly predicated on a "least intrusive means" analysis, properly determined that New Jersey's regulations afforded sufficient due process protections with respect to forcibly medicating the mentally ill without the need for interposing external judicial requirements.[9] By focusing on professional judgment, the exercise of which would include the considerations I have discussed, it is obvious that the New Jersey procedures provided in Administrative Bulletin 78-3 satisfy the due process requirements adopted by the Supreme Court in Youngberg. Thus, I would affirm our previous judgment but I would do so without reliance on any "least restrictive means" standard.
 
 
 9
 I am aware that intervening events have occurred since the district court entered its judgment.[10] I am also aware that the district court's order that we modified involved not a permanent, but a preliminary, injunction. Recognizing these circumstances, I would remand to the district court for further proceedings consistent with the principles discussed in both the Supreme Court's Youngberg v. Romeo decision and the foregoing opinion in support of the judgment that I would affirm today.
 
 
 10
 ADAMS, Circuit Judge, concurring in the result.
 
 
 11
 I have no doubt that the New Jersey regulations found in Administrative Bulletin 78-3 satisfy the due process requirements of the Constitution. I also agree that today's decision is controlled by Youngberg v. Romeo, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), rev'g Romeo v. Youngberg, 644 F.2d 147 (3d Cir.1981) (in banc). I cannot, however, join in the limited professional judgment standard articulated by Judge Garth and, as the author of the least intrusive means standard enunciated in Romeo, I believe it is incumbent upon me to write separately.
 
 
 12
 The issue before this Court continues to be the definition of the constitutional rights afforded the mentally ill and mentally retarded who are involuntarily institutionalized. In Romeo, we reversed the district court's holding that the only substantive restraints upon the states in this context were found in the Eighth Amendment's prohibition of cruel and unusual punishment. We found instead that involuntarily institutionalized persons retain liberty and due process interests in minimally adequate care and treatment. This declaration of constitutional rights was specifically affirmed by the Supreme Court. Youngberg, supra, 457 U.S. at 318-19, 102 S.Ct. at 2459-60. The Supreme Court, however, rejected the use of the least intrusive means test and endorsed the standard articulated by Chief Judge Seitz:
 
 
 13
 The Constitution only requires that the courts make certain that professional judgment in fact was exercised. It is not appropriate for the courts to specify which of several professionally acceptable choices should have been made.
 
 
 14
 Id. (quoting Romeo v. Youngberg, 644 F.2d at 178 (Seitz, C.J., concurring) ).
 
 
 15
 Had the Supreme Court not rejected the least intrusive means test in Youngberg, I would stand by that principle unreservedly. The treatment of those who have committed no crime and are institutionalized simply as a result of illness or incapacity has for too long been a blot on aspirations for a humane and just society. The Constitution does not tolerate "warehousing" patients or recklessly placing them in physical constraints or on antipsychotic drugs for the administrative convenience of state institutions. This was the underlying concern in our Romeo opinion and, in my view, that concern survives the Supreme Court's reversal in Youngberg.
 
 
 16
 What does not appear to survive Youngberg is the least intrusive means test. Much as I agree with the sentiments expressed in Judge Weis's opinion, I do not believe that the difference between the effects of physical restraints and antipsychotic drugs suffices to preserve a higher constitutional standard for the administration of the latter. Whether the long-term effects of prolonged shackling are more or less pronounced than the effects of the short-term administration of drugs to combat a psychotic episode is not presently before this Court. Without such an empirical determination, I do not believe that a constitutional distinction can be drawn between the use of drugs and physical restraints. Thus, I believe that Youngberg must be read to control the forcible administration of antipsychotic drugs to involuntarily institutionalized persons.
 
 
 17
 The Supreme Court's remand of this action specifically directed us to reevaluate our previous holding in light of Youngberg. Rennie v. Klein, 458 U.S. 1119, 102 S.Ct. 3506, 73 L.Ed.2d 1381 (1982). Under Youngberg, a court must determine whether "the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." 457 U.S. at 323, 102 S.Ct. at 2462 (footnote omitted). The key question on remand therefore is to give an operative meaning to the somewhat amorphous "professional judgment" standard.
 
 
 18
 Our point of departure is the recognition of constitutional rights for the involuntarily institutionalized. A constitutional standard which provided no protection beyond that of the tort of medical malpractice would be inappropriate for the involuntarily institutionalized mentally ill. These patients are not in a position to "shop around" for a second opinion, to reject the treatment prescribed, or to insist upon their right to "informed consent." Because such patients are dependent on the state they must be granted a measure of protection beyond that afforded the average citizen.
 
 
 19
 I therefore agree with Chief Judge Seitz that the Supreme Court's "professional judgment" standard in Youngberg provides primarily a starting point for defining the constitutional rights at stake in this case. The professional judgment of a physician acting with the power of state authority requires more than comparable professional decisions in a voluntary doctor-patient relationship. In the case of the forcible use of antipsychotic drugs, a state-employed physician must, at the very least, consider the side effects of the drugs, consult with other professionals and investigate other options available before that physician can be said to have discharged full professional judgment.[1]
 
 
 20
 Consequently, I take issue with the narrow holding of Judge Garth's opinion which would allow antipsychotic drugs to be:
 
 
 21
 constitutionally administered to an involuntarily committed mentally ill patient whenever, in the exercise of professional judgment, such an action is deemed necessary to prevent the patient from endangering himself or others.
 
 
 22
 At 269. The determination whether the patient poses a threat to himself or others, to my mind, precedes even the contemplation of the forcible administration of antipsychotic drugs. Indeed, no citizen of New Jersey could be involuntarily institutionalized absent such a determination. Title 30:4-23 of the New Jersey Statutes defines "mental illness" as the existence of "mental disease to such an extent that a person so afflicted requires care and treatment for his own welfare, or the welfare of others, or of the community." N.J.Stat.Ann. (1981). Such persons may be forcibly institutionalized under Title 30:4-27 only where there is a danger that the patient may injure himself or some other member of the public. DiGiovanni v. Pessel, 104 N.J.Super. 550, 250 A.2d 756 (1969). See also 1 Harper & James, Law of Torts Sec. 315 (1956) ("an officer or a citizen may take in custody an insane person when it is reasonably necessary to prevent threat of harm to himself or others").
 
 
 23
 It therefore provides little protection for such citizens to allow the precondition for their involuntary institutionalization to suffice as the constitutional basis for the forcible administration of antipsychotic drugs. Accordingly, such a minimum determination would not appear to conform to the constitutional professional judgment standard.
 
 
 24
 Because the New Jersey regulations would satisfy any of the standards set forth in the various opinions, I concur in the result reached affirming the preliminary injunction and remanding this case to the district court in light of Romeo as modified by Youngberg and today's opinions.
 
 
 25
 BECKER, Circuit Judge, joins in this concurrence.
 
 
 26
 SEITZ, Chief Judge, concurring.
 
 
 27
 I agree with Judge Garth that persons who have been involuntarily committed to a mental institution have a qualified constitutional right to refuse antipsychotic medication. I also agree that the State of New Jersey has a countervailing interest in administering these drugs to an unwilling patient in certain circumstances, and that the procedures set forth in Administrative Bulletin 78-3 accommodate these various interests in a manner consistent with the Due Process Clause. I am writing, however, because of my different understanding of the Supreme Court's instruction that we reconsider this case in view of the Court's recent holding in Youngberg v. Romeo, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982).
 
 
 28
 In Youngberg, the Court held that mentally retarded people who have been involuntarily committed have due process rights to be safe and free from bodily restraint, and that these rights are protected by a requirement that any infringement must be based on the "professional judgment" of the institution's staff. In my view, Judge Garth's opinion does not sufficiently relate his analysis to this standard.
 
 
 29
 There can be no doubt that persons who have been involuntarily committed to institutions possess certain due process rights. Among these are "liberty interests in safety and freedom from bodily restraint." Youngberg, 457 U.S. at 319, 102 S.Ct. at 2460.[1] A related liberty interest, central to the present inquiry, is the right to refuse medical treatment, including antipsychotic drugs. These rights, however, are not absolute and must yield in certain circumstances to other, more important interests. The fact of legal, involuntary institutionalization is one such circumstance.[2]
 
 
 30
 Involuntary confinement represents a transfer from the patient to the State of the authority to make certain decisions affecting the patient's welfare. This transfer of authority is justified as an exercise of both the State's police power to protect society generally, and the State's parens patriae power to protect a citizen's interests when the citizen is incapable of protecting those interests himself. Although differences between these two powers may be clear in some instances, they are not readily distinguishable in the present circumstances. Even when the sole justification offered for a patient's confinement is that he is dangerous to himself or others, as in New Jersey, and not that he is incompetent, there is the inescapable fact that such confinement is a benefit to the patient as well as to society--a benefit which the patient is incapable of securing for himself. But see Developments, Civil Commitment of the Mentally Ill, 87 Harv.L.Rev. 1190 (1974).
 
 
 31
 The justification for the administration of the antipsychotic drugs is not unrelated to this question of the State's confinement of the patient. Where the State has removed the patient from society because he is dangerous, it is empowered to make additional decisions that affect his welfare. As explained above, the power to make these decisions is supported by the dual interests in society's and the patient's welfare. The State is not restricted to helping the patient only if he wishes to be helped. That limitation was overcome when the patient was confined. The State may therefore make decisions about different treatments that offer some hope of improving the patient's condition and returning him to his community.
 
 
 32
 The issue before this Court is the constitutional standard which should apply to ensure a proper balance between the State's interests and the mental patient's due process rights in situations where the State wishes to administer antipsychotic drugs against the patient's wishes. In Youngberg, the Supreme Court concluded that the State may restrict a retarded person's interests in safety and freedom from bodily restraint, but only where such restrictions are the product of a "professional judgment." 457 U.S. at 321, 102 S.Ct. at 2461. It is unclear whether the right to refuse antipsychotic drugs deserves greater protection than the rights at issue in Youngberg. Bodily restraints obviously impinge very directly on the patient's liberty, but they are also unlikely to have long-term effects. Health risks, on the other hand, may have irreversible consequences that are both immediate and long-term. Similarly, antipsychotic drugs may have dangerous and irreversible side effects in both the short and the long term. What is clear is that all of these practices present substantial threats to the due process rights of the patient. At the same time, they require that professional staff members make complex decisions based on many factors which they are in the best position to evaluate.
 
 
 33
 It is my view that the standard adopted by the Supreme Court in Youngberg provides, at the very least, a starting point for accommodating the various interests involved in any decision to administer antipsychotic drugs to an unwilling patient. I would therefore hold, more explicitly than Judge Garth has done, that the Due Process Clause at a minimum requires the authorities to administer antipsychotic drugs to an unwilling patient only where the decision is the product of the authorities' professional judgment. The decision of a professional staff person will be presumed valid unless it is shown to be a "substantial departure from accepted professional judgment, practice or standards." Youngberg, 457 U.S. at 323, 102 S.Ct. at 2462.
 
 
 34
 The decision whether to administer drugs is by its nature fact-specific. As a general matter, however, the physician must consider both the welfare of the patient and the interests of society as a whole. This requires a consideration of whether there may be any harmful side effects to the patient and whether there are possible alternatives to the use of the drugs. In addition, the physician's decision to use the drugs must be based on a contemporary judgment that the drugs either (1) are an appropriate part of the effort to treat the existing disorder that warrants the patient's continued confinement, or (2) must be administered in response to, or in anticipation of, the patient's violent outbreaks. Use of the drugs may not be justified purely on economic or administrative grounds, as part of an attempt to "warehouse" the patient.
 
 
 35
 The regulations in New Jersey Administrative Bulletin 78-3 satisfy these requirements imposed by the professional judgment standard. The procedures provide that the physician shall meet with the patient to explain "his assessment of the patient's condition; his reasons for prescribing the medication; the benefits and risks of taking the medications; and the advantages and disadvantages of alternative courses of action." Ad.Bull. 78-3 Sec. II(B). In addition, the regulations require that the physician base his decision to administer the drugs on one of three alternative findings: (1) that the patient will harm himself or others without the drugs; (2) that the patient cannot improve without the drugs; or (3) that the patient can improve without the drugs, but only at a significantly slower rate. Sec. II(2).
 
 
 36
 In addition, the regulations establish a system of review by other professional staff members at the institution. In order to administer antipsychotic drugs over the patient's protest, the physician is required to meet with the "treatment team" to discuss the matter. He must also encourage the patient to discuss the proposed medication with relatives or friends. Finally, the physician must submit the entire case to the medical director, whose concurrence is required before commencement of the medication. Sec. II(B), (C). Afterwards, the plan of medication must be reviewed weekly. Sec. II(E)(2). All of these steps must be documented. Sec. II(E)(3).
 
 
 37
 I have no doubt that the New Jersey scheme for administering antipsychotic drugs to unwilling patients satisfies the due process requirements adopted by the Supreme Court in Youngberg. The scheme not only requires that the decision be the product of a professional judgment, but it specifies in some detail the particular type of professional judgment that must be exercised. In addition, the scheme imposes certain procedural requirements to ensure the appropriateness of the decision. Because the availability of the procedural protections is not an issue in this case, however, it is not necessary to decide whether such procedural protections are required under the Due Process Clause, or whether they are committed to the discretion of the state.
 
 
 38
 Although I entertain a different understanding of the Supreme Court's direction that this court reconsider its judgment in view of Youngberg, I concur with Judge Garth's conclusion that the New Jersey regulations satisfy the requirements of due process.
 
 
 39
 WEIS, Circuit Judge, concurring, with whom A. LEON HIGGINBOTHAM, Jr. and SLOVITER, Circuit Judges, join.
 
 
 40
 It is important to note at the outset that the court reaffirms its holding that involuntarily committed mentally ill patients have a constitutional right to refuse administration of antipsychotic drugs. On that point, all members of the court agree. I differ with Judge Garth's opinion only on the least intrusive means issue and, on that point, adhere to my former opinion. See Rennie v. Klein, 653 F.2d 836, 838-854 (3d Cir.1981) (in banc ).
 
 
 41
 It is regrettable that the remand has caused this court to retreat from the modest advance it made in applying the least intrusive means test to the long-term involuntary administration of these drugs. This rejection is particularly disheartening because it is based on Youngberg v. Romeo, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), where the Supreme Court found that the least intrusive standard was not relevant to the facts presented there, and the plaintiff conceded that it was not an issue. Id. at 313-14 n. 14, 102 S.Ct. at 2457 n. 14. The Supreme Court's opinion did not purport to govern the least intrusive means issue in the case at hand. I would take the Court at its word.
 
 
 42
 Even if Romeo rejected sub silentio the least intrusive test for the circumstances of that case, the decision would not, in my view, govern the standard for long-term forceable administration of antipsychotic drugs. In Romeo, the alleged constitutional violations were: first, the failure to provide for a resident's safety in terms of protecting him from his own violent acts and those of other inmates; second, the imposition of unreasonable bodily restraints--in that case, physical ones, such as shackles; and finally, the failure to provide minimal "habilitation" or training related to safety and freedom from restraints.
 
 
 43
 In measuring the state's obligations in the context of the safety and restraint issues, the Supreme Court approved Chief Judge Seitz's standard that "the courts [are to] make certain that professional judgment in fact was exercised. It is not appropriate for the courts to specify which of several professionally acceptable choices should have been made." Id. at 321, 102 S.Ct. at 2461.
 
 
 44
 The majority reads into the Supreme Court's remand an implicit disapproval of the least intrusive means test in the circumstances present here.[1] I do not detect any such message. Moreover, because of the substantial factual differences, I do not agree with the application of Romeo to this case.
 
 
 45
 Most significantly, the restraints at issue in Romeo were not measures bearing potentially permanent effects that would be physically or mentally crippling. If physical means such as straightjackets or hand "muffs" are used, the restraint can be removed without any permanent after-effects.[2] An erroneous decision on these restraints, therefore, can be corrected and, although past discomfort and frustration might not be undone, the effects do not continue into the future.
 
 
 46
 By contrast, the long-term administration of antipsychotic drugs may result in permanent physical and mental impairment. As our earlier opinion noted, all antipsychotic drugs affect the central nervous system and induce a variety of side effects. 653 F.2d at 843. Minor physical effects include blurred vision, constipation or diarrhea, palpitations, skin rashes, low blood pressure, faintness, and fatigue. Some patients experience akinesia--a state of diminished spontaneity, physical weakness, and muscle fatigue; others suffer akathesia, which is marked by a subjective state and an inability to be still.
 
 
 47
 Although these conditions usually diminish, antipsychotic drugs can also induce a permanent disorder known as tardive dyskinesia. It is "characterized by rhythmical, repetitive, involuntary movements of the tongue, face, mouth, or jaw, sometimes accompanied by other bizarre muscular activity." Rennie v. Klein, 462 F.Supp. 1131, 1138 (D.N.J.1978). In addition, the effects on the patient's condition may not be limited to those produced directly by the drugs. For example, one patient's diet is now restricted to ground food because the involuntary jaw movements resulting from tardive dyskinesia were so severe that she could not be fitted with dentures.[3]
 
 
 48
 Unlike the temporary and predictable effects of bodily restraints, the permanent side effects of antipsychotic drugs induce conditions that cannot be corrected simply by cessation of the regimen. The permanency of these effects is analogous to that resulting from such radical surgical procedures as a pre-frontal lobotomy. The consequences of error are far more serious in the drug cases than those of Romeo's physical restraints, and therefore, a standard commensurate with the potential harm to the patient is required.
 
 
 49
 The majority holds that the drugs may be constitutionally administered if the decision is made as a result of a "professional judgment" by the institution staff. Although one of the elements to be weighed is the side effects the patient will suffer, the majority apparently regards this factor as having no greater weight that any other consideration. I fear that the latitude the majority allows in "professional judgment" jeopardizes adequate protection of a patient's constitutional rights.
 
 
 50
 In my view, it is not enough to rely on a "professional judgment" unless it includes an evaluation aimed at the least intrusive means--a cost-benefit analysis viewed from the patient's perspective. A "professional judgment" based primarily on administrative convenience or the purely economic interest of the state does not pass muster.[4] If less intrusive means to accomplish the state's legitimate objectives are available and feasible, then administrative and financial concerns are simply not significant enough to justify a patient's exposure to the serious risks accompanying use of these drugs. For this reason, the standard approved in the circumstances of Romeo has serious deficiencies when transferred to Rennie's situation.[5]
 
 
 51
 Although the majority and I diverge on the applicability of the least intrusive means doctrine, it should be apparent that in application our difference is primarily one of emphasis. To me, the least intrusive doctrine directs that professionals give greater consideration to the potential danger to the patient than to the state's administrative convenience or economic benefits. Since the majority incorporates harm to the patient as one of the elements of the "professional judgment," it may be that in most cases the outcome would be the same under both tests. Although the difference in standards may be only one of degree, it is nevertheless an important one.
 
 
 52
 In adhering to the least intrusive test, I have not overlooked the Supreme Court's emphasis in Romeo that courts show deference to the judgment exercised by a qualified professional, so as to minimize judicial interference with the functioning of the institution. As noted earlier, the consequences of errors in Romeo's context are not as severe as those present here. Nevertheless, some deference to professional decisions is not inconsistent with our holding on procedural due process.
 
 
 53
 I agree with the court's holding that the administrative procedures designed by New Jersey, which consist of review by professionals in the mental health field, are adequate to protect the patient's constitutional rights. Introduction of the least intrusive means standard into these procedures does not supplant professional judgment; it merely adds an important factor to the analysis underlying that judgment. The least intrusive test does not constitute undue interference with professional judgment, and is surely defensible to the extent it mandates serious and deliberate consideration of the patient's interest.
 
 
 54
 Moreover, the least intrusive means standard does not mandate that the state forfeit its interests or leave them unfulfilled. It simply requires a carefully considered choice. That burden is certainly minimal when compared to the potential consequences to the patient. As the Supreme Court has stated, "The individual should not be asked to share equally with society the risk of error when the possible injury to the individual is significantly greater than any possible harm to the state." Addington v. Texas, 441 U.S. 418, 427, 99 S.Ct. 1804, 1810, 60 L.Ed.2d 323 (1979).
 
 
 55
 One other factor mentioned in Romeo --the financial constraints under which state institutions necessarily operate--merits some brief comment. That consideration was mentioned in our earlier opinion as one reason why the simplified administrative procedure we approved was more acceptable than the elaborate plan devised by the district court. See 653 F.2d at 851. I recognize the very serious financial problems of state institutions, but I do not believe that they militate against use of the least intrusive means test. To the contrary, the realization that state institutions are understaffed, underfinanced, and overcrowded only underscores my concern that the staff may undervalue or overlook the patient's interest. Concern for the rights of the patient must not be sacrificed for the convenience of the state.
 
 
 56
 It is worth remembering that patients at these mental institutions are unwilling wards of the state. They have done nothing to merit anything but consideration and compassion. It surely is not asking too much of the state to require it to balance its legitimate needs with a regimen that infringes on the patient's constitutional rights to the least intrusive extent.
 
 GIBBONS, Circuit Judge, dissenting:
 
 57
 I join in Judge Weis' opinion setting forth the legal standards applicable by virtue of the fourteenth amendment to the involuntary imposition of medical treatment by persons acting under color of state law. Unlike Judge Weis, however, I dissent from the judgment insofar as it modifies the preliminary injunction which was entered by the trial court. The reasons for my dissent are set out in the opinion which I filed when the case was first considered by the full court. See Rennie v. Klein, 653 F.2d 836, 865-70 (3d Cir.1981) (in banc), Gibbons, J. dissenting. They need not be repeated. I would affirm the district court in all respects.
 
 
 
 [1]
 For additional factual and procedural background see Rennie v. Klein, 653 F.2d 836 (3d Cir.1981) (in banc)
 
 
 [2]
 The district court conditionally certified three sub-classes. For purposes of this proceeding, we are concerned only with the second sub-class, which consists of all adult patients involuntarily committed to any of New Jersey's five state mental health facilities. Rennie v. Klein, 653 F.2d 836, 839 (3d Cir.1981) (in banc)
 
 
 [3]
 Since that time there has been extensive legal commentary treating this subject. See, e.g., Note, Beyond Youngberg: Protecting the Fundamental Rights of the Mentally Retarded, 51 Fordham L.Rev. 1064 (1983); Comment, The Scope of the Involuntarily Committed Mental Patient's Right to Refuse Treatment with Psychotropic Drugs: An Analysis of the Least Restrictive Alternative Doctrine, 28 Villanova L.Rev. 101 (1983); Note, A Common Law Remedy for Forcible Medication of the Institutionalized Mentally Ill, 82 Colum.L.Rev. 1720 (1982)
 
 
 [4]
 On appeal to this court Romeo attacked the district court's instructions to the jury. Our in banc opinion held, inter alia, that for a defendant to be free from liability, the defendant had to demonstrate that the restraints imposed were the "least restrictive means" of handling the patient, and that the treatment selected was the "least intrusive treatment" available under the circumstances. See, e.g., Romeo v. Youngberg, 644 F.2d 147, 166-68, 172-73 (3d Cir.1980) (in banc)
 
 
 [5]
 See also Administrative Bulletin 78-3, Sec. II(2)(b)(ii) ("... whenever there is a significant possibility that the patient will harm himself or others before improvement of this condition is realized, if medication is not administered.")
 
 
 [6]
 The standard espoused by Judge Adams mandates, in my opinion, no materially different analysis than the standard advocated here. Judge Adams requires, as do I, that "[t]he determination whether the patient poses a threat to himself or others ... precede[ ] even the contemplation of the forcible administration of antipsychotic drugs," typescript at 5, and both Judge Adams's standard and mine require the exercise of professional judgment prior to the administration of antipsychotic drugs. Typescript at 4
 
 
 [7]
 The Supreme Court in Youngberg expressly declined to deal with the issue of antipsychotic drugs because, as the separate opinions in our Romeo case pointed out, see 644 F.2d 147, 173 n. 1 (Seitz, C.J., concurring); id. at 183-84 (Aldisert, J., concurring); and id. at 186 (Garth, J., concurring), the Romeo record did not present the problem of antipsychotic drugs and their forcible administration. Youngberg, 457 U.S. at 319, 102 S.Ct. at 2460
 
 
 [8]
 The essential difference between the constitutional standard proposed by Chief Judge Seitz and that announced here is that Judge Seitz would leave it to the professional judgment of the medical authorities as to whether antipsychotic drugs could be forcibly administered to involuntarily committed patients even in the absence of a threshold determination that the patient was a danger to himself or others. The standard adopted here would preclude the forcible administration of such drugs unless the predicate determination was made that the patient was a danger either to himself or others
 
 
 [9]
 See Rennie v. Klein, 653 F.2d at 848-54. Among other things, the procedures provide that, in the event a patient protests the administration of antipsychotic medication, the attending physician shall explain his reasons for prescribing the drugs and shall set forth the drugs' benefits and risks. Sec. II(B). The regulations limit the administration of antipsychotic drugs to three specific situations. Sec. II(2). In addition, the procedures establish a system of consultation with the patient, including encouraging the patient to seek outside advice from family and friends, review by other professional staff at the institution, and required meetings with a "treatment team" if the patient still refuses such medication. The physician is also required to submit the entire case to the medical director, whose concurrence is required before commencement of the medication, Sec. II(B), (C), and the plan of medication must be reviewed weekly once begun. Sec. II(E)(2)
 Although I find that the procedures specified in Administrative Bulletin 78-3 satisfy due process requirements under the constitutional standard announced in text above, I have not addressed nor approved any interpretation of the regulations which arguably might constitute a departure from that standard. See, e.g., Sec. II(2). Inasmuch as no specific provision of the regulation has been challenged, that subject, if raised, should be left to the district court for its determination in the first instance.
 
 
 [10]
 For example, Judge Weis noted in the majority in banc opinion that the Mental Health Systems Act, 42 U.S.C. Secs. 9401-9503 (1980), which includes a "Bill of Rights" for mental health patients, was enacted subsequent to the district court's decision. In that regard, Judge Weis noted that the district court, having retained jurisdiction, may "in its discretion consider the Mental Health Systems Act as relevant to the remaining proceedings." 653 F.2d at 852 n. 17
 
 
 [1]
 I believe that this view is consistent with Chief Judge Seitz's concurrence: "[t]he decision to administer drugs ... requires a consideration of whether there may be any harmful side effects to the patient and whether there are possible alternatives to the use of the drugs." At 274. Thus, this standard governs the necessarily difficult decisions made by professional staff members in the "hope of improving the patient's condition and returning him to his community." Id. 273
 
 
 [1]
 Although the facts of Youngberg concerned the mentally retarded, the language and analysis of the opinion clearly apply to the class of persons who have been committed involuntarily. Cf. Youngberg, 457 U.S. at 315-16, 102 S.Ct. at 2458
 
 
 [2]
 There is no suggestion in the present case that the involuntary commitments of the members of the plaintiff class were illegal
 
 
 [1]
 Justice Brennan joined the Court's opinion in Romeo, 457 U.S. at 325, 102 S.Ct. at 2463, but commented in his dissent in Jones v. United States, --- U.S. ----, ---- - ----, 103 S.Ct. 3043, 3059-61, 77 L.Ed.2d 694 (1983), on the "psychopharmacological management of the hospitalized person." "Although this Court has never approved the practice, it is possible that an inmate will be given medication for reasons that have more to do with the needs of the institution than with individualized therapy. See Mills v. Rogers, 457 U.S. 291, 298, 102 S.Ct. 2442, 2448, 73 L.Ed.2d 16 (1982); Rennie v. Klein, 653 F.2d 836, 845 (CA3 1981) (en banc ). We should not presume that he lacks a compelling interest in having the decisions to commit him and to keep him institutionalized made carefully, and in a manner that preserves the maximum degree of personal autonomy." (Emphasis added.)
 
 
 [2]
 Although this court's opinion in Romeo had described the restraints as "shackles," 644 F.2d 147 (3d Cir.1980), the Supreme Court noted that the measures generally used were " 'soft' restraints, for the arms only," 457 U.S. at 310 n. 4, 102 S.Ct. at 2455 n. 4, and that the program designed for Romeo called for "use of 'muffs' on [his] hands for short periods of time, i.e., five minutes, to prevent him from harming himself or others," id. at 311 n. 8, 102 S.Ct. at 2455 n. 8
 
 
 [3]
 Additional descriptions of the side effects of antipsychotic drugs can be found in Plotkin, "Limiting the Therapeutic Orgy: Mental Patient's Right to Refuse Treatment," 72 N.W.U.L.Rev. 461, 474-78 (1978); Rhoden, "The Right to Refuse Psychotropic Drugs," 15 Harv.C.R.-C.L.L.Rev. 363, 375-82 (1980)
 
 
 [4]
 References to the literature on the use and abuse of antipsychotic drugs may be found in Comment, "The Scope of the Involuntarily Committed Mental Patient's Right to Refuse Treatment with Psychotrophic Drugs: An Analysis of the Least Restrictive Alternative Doctrine," 28 Vill.L.Rev. 101 (1983); Note, "A Common Law Remedy for Forceable Medication of the Institutionalized Mentally Ill," 82 Colum.L.Rev. 1720 (1982)
 
 
 [5]
 Mills v. Rogers, 457 U.S. 291, 102 S.Ct. 2442, 73 L.Ed.2d 16 (1982), is further evidence that the Supreme Court did not require the imposition of the Romeo standard in the antipsychotic drug cases. In Mills, a case similar to the one at hand, the Court remanded to the court of appeals for reconsideration in light of intervening changes in state law. Although the Court of Appeals for the First Circuit had adopted the least intrusive test, as had we, the Supreme Court made no adverse reference to the test in its opinion directing a remand