816 P.2d 510

**Frank GARCIA, Plaintiff–Appellant and Cross–Appellee,**

v.

**LAS VEGAS MEDICAL CENTER, a/k/a Las Vegas State Hospital, et al., Defendants–Appellees and Cross–Appellants.**

**No. 11591.**

Court of Appeals of New Mexico.

April 30, 1991.

Certiorari Denied July 31, 1991.

Ronald J. VanAmberg, Roth, VanAmberg, Gross & Rogers, Santa Fe, for plaintiff-appellant and cross-appellee.

J. Duke Thornton, Paul T. Yarbrough, Butt, Thornton & Baehr, P.C., Albuquerque, for defendants-appellees and cross-appellants.

OPINION

HARTZ, Judge.

Pursuant to the federal Civil Rights Act, 42 U.S.C. § 1983 (1982), Mr. Frank Garcia filed a complaint against various defendants, alleging violations of his civil rights during his detention in the Las Vegas Medical Center (LVMC). On appeal he has abandoned all claims except certain allegations against two LVMC employees in their individual capacities: Dr. Bancroft Brooks, a supervising doctor at LVMC, and Dr. Steven Wong, a supervising psychologist at LVMC. In particular, recognizing that LVMC is not a person subject to liability under Section 1983, *see Will v. Michigan Dep't of State Police,* 491 U.S. 58, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989), Mr. Garcia has admitted the validity of the cross-appeal by LVMC, so we reverse the district court's order denying LVMC's motion to dismiss.

The district court granted summary judgment in favor of Dr. Brooks and Dr. Wong. Oral argument before this court clarified the specific claims that Mr. Garcia is pressing against these two defendants. As we understand his claims, Mr. Garcia alleges that Dr. Brooks and Dr. Wong deprived him of liberty without due process of law, in violation of the United States Constitution, in that (1) he was beaten and subjected to other physical abuse at LVMC; (2) he was detained at LVMC for an excessive period (twenty days) without an adversary judicial proceeding to determine whether he was properly confined; and (3) he was improperly injected with a psychotropic drug.[1] Because Dr. Brooks and Dr. Wong have conceded that they are not entitled to summary judgment with respect to the first allegation, we remand to the district court for further proceedings on that matter. We affirm the summary judgment in favor of Dr. Brooks and Dr. Wong on the second allegation. We remand for further proceedings on the third allegation.

I. BACKGROUND

On November 29, 1984, Las Vegas police officers arrested Mr. Garcia in a motel room and took him to jail. At the jail he apparently attempted to hang himself with a T-shirt while in his cell and then fought with police when they intervened. He claims that he faked the hanging in order to lure a particular police officer into his cell so that he could "continue the confrontation." Mr. Garcia was delivered to LVMC at approximately 1:00 a.m. on December 1 for emergency detention. Fourteen hours later he was examined for the first time by a physician, Dr. Brooks. During the fourteen-hour interval he received two injections of Haldol, a psychotropic drug.

A New Mexico statute in effect at the time provided that every adult client involuntarily admitted to an evaluation facility for emergency evaluation and care "has the right to a hearing within seven days of admission unless waived after consultation with counsel." NMSA 1978, § 43–1–11(A) (Repl.Pamp.1989). If the Health and Environment Department (the department), a physician, or an evaluation facility decided to seek commitment of a client for evaluation and treatment, a petition requesting the commitment had to be filed with the court within five days of admission. *Id.* Copies of the petition were required to be served on the client and the client's attorney. *Id.*

On December 5, 1984, counsel for the department filed a "petition for thirty day commitment for mental health evaluation and treatment," attaching an initial screening report by Dr. Brooks and stating that Dr. Brooks would testify in support of the petition. The following day an attorney was appointed to represent Mr. Garcia. The attorney was served with the petition, but Mr. Garcia was not. Although the practice of the district court was to hold commitment hearings on Thursdays at LVMC, other court matters were scheduled on the two Thursdays following Mr. Garcia's commitment. Therefore, no commitment hearing was scheduled until Thursday, December 20. Mr. Garcia's attorney

---

**1.** Giving Mr. Garcia the benefit of the doubt, *see Shea v. H.S. Pickrell Co.,* 106 N.M. 683, 748 P.2d 980 (Ct.App.1987), we read these allegations into Count I of the complaint.

did not complain about the delay. Apparently he did not consult with Mr. Garcia until December 19. On December 20, Mr. Garcia was released prior to the court proceeding.

## II. LIABILITY FOR DAMAGES UNDER SECTION 1983

To resolve this appeal, we must first consider two general issues that arise when state officials are sued for damages under Section 1983. We introduce those issues now and then proceed to a more complete discussion.

■ One issue is qualified immunity. A public official is not liable for damages under Section 1983 unless the right violated by the official was clearly established at the time of the violation. The events in this case occurred in 1984. Thus our task is not to express our present view of the scope of Mr. Garcia's rights; it is to decide what was the settled law in 1984 regarding those rights. If in 1984 there was substantial authority—perhaps from other jurisdictions—that an alleged right did not exist, then our inquiry is at an end.

■ The second issue is the nature of the rights protected by Section 1983. Those rights are federal rights. Violation of state law does not in itself create liability under Section 1983. State law may, however, be relevant. In determining what procedural rights are required by federal due process, courts look to the substantive right to be protected by the procedure. That substantive right may be created by state law. The interrelationship between state law and federal rights is a subtle one.

### A. Qualified Immunity

The Supreme Court has held: "[G]overnment officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982) (alleged conspiracy to discharge employee). The Court explained:

On summary judgment, the judge appropriately may determine, not only the currently applicable law, but whether that law was clearly established at the time an action occurred. If the law at that time was not clearly established, an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to "know" that the law forbade conduct not previously identified as unlawful.

*Id.* (footnote omitted).

■ The "law" that must be clearly established is the federal law that the government official allegedly violated. Even if the government official clearly violated state law, the official is not liable if it was not clear that the action violated the federal law serving as the predicate for the Section 1983 claim. As the Supreme Court stated in *Davis v. Scherer,* 468 U.S. 183, 194, 104 S.Ct. 3012, 3019, 82 L.Ed.2d 139 (1984): "Officials sued for constitutional violations do not lose their qualified immunity merely because their conduct violates some statutory or administrative provision." The Court rejected the plaintiff's contention "that a defendant official's violation of a clear statute or regulation, although not itself the basis of suit, should deprive the official of qualified immunity from damages for violation of other statutory or constitutional provisions." *Id.* at 193, 104 S.Ct. at 3018.

Thus, in this case even if defendants' conduct clearly violated New Mexico statutes, they would still be entitled to immunity from liability under Section 1983 if their actions did not clearly violate federal due process at the time of Mr. Garcia's commitment.

### B. Relevance of New Mexico Statutes to a Federal Claim under Section 1983

A good part of the appellate briefs is devoted to argument between the parties concerning whether Mr. Garcia's commitment violated New Mexico procedural statutes in effect at the time. Section 1983, however, imposes liability only for violation

of federal rights.[2] *See Sampley v. Ruettgers,* 704 F.2d 491, 494 (10th Cir.1983); *Casines v. Murchek,* 766 F.2d 1494, 1501 n. 10 (11th Cir.1985). State law is relevant only insofar as federal rights are dependent on state law.

The federal constitutional right to procedural due process may in one respect be determined by reference to state law. To resolve what process is mandated by the Constitution, courts must consider "the private interests at stake in a governmental decision, the governmental interests involved, and the value of procedural requirements." *Hewitt v. Helms,* 459 U.S. 460, 473, 103 S.Ct. 864, 872, 74 L.Ed.2d 675 (1983). The first two elements—the private interest and the competing governmental interest—are often defined by state law. A statute may identify a private interest protected by state law and describe the circumstances in which that interest is outweighed by competing concerns. If the resulting substantive right is more extensive than what federal law provides, the state substantive right may be the basis for deciding what procedures are required by the federal Constitution. "Because state-created liberty interests are entitled to the protection of the federal Due Process Clause, the full scope of a patient's due process rights may depend in part on the substantive liberty interests created by state as well as federal law." *Mills v. Rogers,* 457 U.S. 291, 300, 102 S.Ct. 2442, 2449, 73 L.Ed.2d 16 (1982) (citations omitted).

State substantive rights, however, must not be confused with procedural requirements. "[I]dentifying the contours of the substantive right remains a task distinct from deciding what procedural protections are necessary to protect that right." *Washington v. Harper,* 494 U.S. 210, 110 S.Ct. 1028, 1036, 108 L.Ed.2d 178 (1990). We agree with *Shango v. Jurich,* 681 F.2d 1091, 1097–98 (7th Cir.1982): "Although the existence of a liberty or property interest may be ascertained by reference to state law, once such an interest is identified, the task of defining the procedural protections which attach to that interest is wholly a matter of federal constitutional law * * *." *See Jacobs v. Meister,* 108 N.M. 488, 493–94, 775 P.2d 254, 259–60 (Ct.App.1989).

Contrary to *Shango,* Mr. Garcia contends that the federal Constitution not only protects state-created liberty interests but also incorporates state-created procedural protections. He apparently relies on the two sentences in *Mills* that immediately follow the sentence quoted above:

> "[A] State may confer procedural protections of liberty interests that extend beyond those minimally required by the Constitution of the United States. If a State does so, the minimal requirements of the Federal Constitution would not be controlling, and would not need to be identified in order to determine the legal rights and duties of persons within that State."

*Mills,* 457 U.S. at 300, 102 S.Ct. at 2449 (emphasis deleted). This passage does not support Mr. Garcia's contention. Rather than stating that the Constitution incorporates state procedural protections, it says that, in the context of that case, if state procedural protections are sufficiently great, there would be no point in identifying what the Constitution requires. *Mills* was reviewing a grant of injunctive relief. The Supreme Court remanded largely on the ground that declarations of state law by the Massachusetts Supreme Judicial Court may have rendered unnecessary a determination of federal constitutional law. There would be no need to decide what federal procedural due process required if the plaintiffs could obtain the desired relief from an injunction ordering compliance with state law.

This is not to say that state statutes with procedural components must be ignored. They may be relevant in identifying a state-created liberty interest or the circumstances that can overcome that interest.

---

**2.** In certain circumstances a state official may be liable under New Mexico law for violation of a state statute, *see* NMSA 1978, Section 41–4–12 (Repl.Pamp.1989); *California First Bank v. State,* 111 N.M. 64, 801 P.2d 646 (1990), but Mr. Garcia has not made such a claim.

*Hewitt v. Helms* illustrates such analysis. First, the Supreme Court held that a convicted prisoner had no constitutionally protected liberty interest in continuing to reside in the general prison population, as opposed to being confined to administrative segregation. Then it found that a protected liberty interest in remaining in the general prison population was provided by Pennsylvania statutes and regulations. The Court noted that Pennsylvania had gone beyond simple procedural guidelines to channel the decision-making of prison officials with respect to disciplinary segregation. The state had "used language of an unmistakably mandatory character, requiring that certain procedures 'shall,' 'will,' or 'must' be employed * * * and that administrative segregation will not occur absent specified substantive predicates— viz., 'the need for control,' or 'the threat of a serious disturbance.'" *Id.*, 459 U.S. at 471–72, 103 S.Ct. at 871. The Court concluded, "[T]he repeated use of explicitly mandatory language in connection with requiring specific substantive predicates demands a conclusion that the State has created a protected liberty interest." *Id.* at 472, 103 S.Ct. at 871.

Still, the limited purpose for which *Hewitt* refers to "procedural" statutes must be emphasized. Their relevance is only in assisting the courts to identify a state-created substantive right.

Having discussed in a general way both qualified immunity and the relevance of state statutes, we now address the particular issues before us. With respect to each of Mr. Garcia's contested claims, we consider, under law clearly established in 1984, what were his substantive rights and whether he was denied constitutionally mandated procedures to protect those rights.

## III. FAILURE TO PROVIDE TIMELY ADVERSARY JUDICIAL HEARING

### A. Substantive Right

To evaluate Mr. Garcia's claim that his right to federal due process was violated by denial of a judicial hearing for twenty days, we must first identify the substantive right at stake. In this case the liberty interest is undoubtedly the interest in being free from involuntary commitment as a mental patient. The conditions under which competing state interests outweighed that liberty interest were set forth in 1984 in Section 43–1–11(C). The statute stated that after a hearing:

[T]he court may order a commitment for evaluation and treatment not to exceed thirty days if the court finds by clear and convincing evidence that:

(1) as a result of a mental disorder, the client presents a likelihood of serious harm to himself or others;

(2) the client needs and is likely to benefit from the proposed treatment; and

(3) the proposed commitment is consistent with the treatment needs of the client and with the least drastic means principle.

The statutory definition of "consistent with the least drastic means principle" was:

[T]he habilitation or treatment and the conditions of habilitation or treatment for the client separately and in combination:

(1) are no more harsh, hazardous or intrusive than necessary to achieve acceptable treatment objectives for such client;

(2) involve no restrictions on physical movement nor requirement for residential care except as reasonably necessary for the administration of treatment or for the protection of such client or others from physical injury; and

(3) are conducted at the suitable available facility closest to the client's place of residence[.]

NMSA 1978, § 43–1–3(D) (Repl.Pamp.1984).

Thus, under state law a client's interest in not being involuntarily committed for evaluation and treatment could be overcome if (1) the client had a mental disorder that created a likelihood of serious harm to the client or others; (2) the client needed and was likely to benefit from the proposed treatment; and (3) the proposed commitment was consistent with the client's treat-

ment needs and the least drastic means principle.[3] The client had a substantive right under New Mexico law not to be confined in the absence of those conditions. We have been directed to no authority suggesting that in 1984 clearly established federal law provided a mental patient involuntarily committed to a state institution with pertinent substantive rights broader than this.

*B. Procedural Rights*

The substantive right having been identified, the final step is to formulate "the minimum procedures required by the Constitution for determining that the individual's liberty interest actually is outweighed in a particular instance." *Mills*, 457 U.S. at 299. The components of the required minimum procedures include such matters as who decides (a court, an in-house administrator, a physician, etc.), the types of evidence that the fact finder may use (personal observation, affidavits, sworn testimony subject to cross-examination, etc.), and the timing of the fact-finding determination (immediately, within seven days, within three weeks, etc.).

Because this is a suit for damages, defendants are entitled to claim qualified immunity. We therefore turn to a consideration of whether at the time of Mr. Garcia's commitment it was clear that federal procedural due process required more than he received.

In 1984 the most relevant New Mexico case was *Ex parte Romero*, 51 N.M. 201, 181 P.2d 811 (1947). That opinion lends substantial support to Mr. Garcia's contention that he was denied constitutional due process by being confined for twenty days without a judicial hearing. *Romero* held that two New Mexico statutes governing civil commitments for mental disorders violated the fourteenth amendment to the United States Constitution because they did not provide for sufficiently prompt court review of the commitment. One statute permitted a hospital or other institution to detain a voluntarily committed patient for up to ten days after the patient provided written notice of his or her desire to leave the institution. The other statute provided that an individual could be involuntarily committed for up to thirty days upon a certificate from a licensed doctor.

■ We are bound by decisions of our state's highest court, *see Alexander v. Delgado*, 84 N.M. 717, 507 P.2d 778 (1973), and must follow a holding of our state supreme court even if the persuasiveness of the opinion has been largely undercut by a subsequent decision of the United States Supreme Court. *See State v. Manzanares*, 100 N.M. 621, 622, 674 P.2d 511, 512 (1983). The issue before us, however, is not what we—the New Mexico Court of Appeals— would have been compelled to rule on the constitutional issue in 1984. Rather, the issue is whether in 1984 it was "clearly established" what the *ultimate* resolution of the issue would be. *See Harlow v. Fitzgerald*. Despite the requirement that this court follow a particular opinion of the New Mexico Supreme Court, a litigant in this state might still have reasonable confidence that ultimately the issue would be decided contrary to that opinion. That possibility is increased in the context of a suit under Section 1983, because a government official claiming qualified immunity could remove the lawsuit to federal court, *see* 28 U.S.C. § 1441(b) (1982), rather than trying to convince the New Mexico Supreme Court to overrule a precedent. Thus, we must examine authority from other jurisdictions, not just the New Mexico Supreme Court, to determine whether the pertinent law was clearly established. Although *Ex parte Romero* may be persuasive precedent, it cannot be said to make the federal law clearly established so as to overcome qualified immunity if decisions in other jurisdictions are to the contrary.

■ Looking at federal cases, it was certainly not clear in 1984 that the Constitution prohibited the involuntary commitment of a mental patient for more than twenty

---

**3.** Although Section 43–1–11(C) permitted only a thirty-day commitment, the same substantive standards also governed more-extended commit-ments. *See* NMSA 1978, § 43–1–12 (Repl.Pamp. 1989).

days without a court hearing. In 1973 *Briggs v. Arafeh*, 411 U.S. 911, 93 S.Ct. 1556, 36 L.Ed.2d 304 (1973), summarily affirmed *Logan v. Arafeh*, 346 F.Supp. 1265 (D.Conn.1972), which upheld a Connecticut statute permitting a substantially longer delay before a court hearing. Upon a physician's certificate that a person was a danger to himself or others as a result of mental illness, the person could be involuntarily committed for up to fifteen days without prior notice or hearing. If a complaint for commitment was filed in court within that fifteen days, confinement could be continued for an additional thirty days (or up to forty-five days in all) without the need for any further court order.

In this case, within five days of Mr. Garcia's commitment to LVMC the state filed in court a formal petition supported by a psychiatric evaluation stating that Mr. Garcia "is very dangerous, both to himself and others, and is in need of treatment that can be administered if he is committed for thirty days." Fifteen days later Mr. Garcia was released. No doubt the Connecticut statutory scheme could be distinguished from New Mexico's in several respects, one of which may provide a principled ground for approving the *Arafeh* decision while still finding that a twenty-day delay under the New Mexico scheme would violate federal due process. Nevertheless, one could hardly draw such an inference from the United States Supreme Court's one-sentence affirmance in *Arafeh*. The conclusion is inescapable that after *Arafeh* it was not clearly established that procedural due process required a court hearing within twenty days of involuntary confinement for a mental disorder.

There is also a second ground upon which to affirm defendants' qualified-immunity defense. It was not clear in 1984 that federal due process would be violated simply by the *absence* of a court hearing, as opposed to the *denial* of a *requested* court hearing. *Curnow v. Yarbrough*, 676 P.2d 1177 (Colo.1984) (en banc), upheld the constitutionality of Colorado's mental-

health-commitment statute despite the absence of a mandatory probable cause hearing. The statute required only that a hearing must be provided within ten days of a request by the patient or the patient's attorney. This decision suggests that procedural due process was satisfied by providing a court hearing promptly after a request by the patient or the attorney. *Cf. Logan v. Arafeh*, 346 F.Supp. at 1269–70 (noting that patient could initiate habeas corpus proceeding).

Here, the district court appointed counsel for Mr. Garcia the day after the state filed its petition. Counsel was armed with a statute requiring a hearing for Mr. Garcia within seven days of admission. There is no evidence of a request for a hearing by either Mr. Garcia or the attorney appointed to represent him during his commitment. The attorney's deposition indicates that he posed no objection to the district court's two-week postponement of the hearing.[4] Although Section 43–1–11(A) states that the hearing must be held within seven days of admission "unless waived after consultation with counsel," *Curnow* suggested that constitutional procedural due process did not require such an affirmative waiver.

In light of *Arafeh* and *Curnow*, defendants are entitled to summary judgment on their qualified-immunity defense to this claim.

## IV. DRUG INJECTIONS

Mr. Garcia also contends that the district court improperly awarded summary judgment to Dr. Brooks and Dr. Wong with respect to his claim that his constitutional rights were violated by the two injections of Haldol prior to his examination by Dr. Brooks. The only ground for summary judgment properly before us is defendants' contention that the injections did not violate Mr. Garcia's constitutional rights, or that the injections at least did not violate constitutional law that was clear in 1984, so that defendants are entitled to qualified immunity.

**4.** Mr. Garcia's attorney at the time may have acted without proper consultation with his client, but nothing in the record suggests that such failure was caused by state action.

Defendants may have abandoned this contention at oral argument. Yet our uncertainty on that point requires us to address the issue. We hold that summary judgment was improper on the record before us.

### A. Substantive Right

Because of defendants' claim of qualified immunity, we focus on the law in 1984. We first identify Mr. Garcia's substantive right. Mr. Garcia had a liberty interest in not being injected involuntarily with Haldol. *See Washington v. Harper*, 110 S.Ct. at 1036 (prisoner "possesses a significant liberty interest in avoiding the unwanted administration of antipsychotic drugs under the Due Process Clause of the Fourteenth Amendment"). To identify what competing state concerns could overcome that interest, we look to New Mexico law. Although we may assume that the United States Constitution itself sets limits on when psychotropic drugs can be administered involuntarily to a confined patient, in 1984 such limits were not clearly more stringent than those required by New Mexico law. *See, e.g., Rennie v. Klein*, 720 F.2d 266 (3d Cir.1983) (en banc).

NMSA 1978 Section 43–1–6(I) (Repl. Pamp.1984) states:

All resident clients have a right to be free from unnecessary or excessive medication * * *. Medication shall be administered only by a licensed physician, registered nurse or licensed practical nurse, or by a medical or nursing student under the direct supervision of a licensed physician or registered nurse * * *. Medication shall not be used as a punishment, for the convenience of staff, as a substitute for programs or in quantities that interfere with the client's treatment or habilitation program.

Section 43–1–7 (Repl.Pamp.1989) states:

Each resident client receiving mental health services shall have the right to prompt treatment pursuant to an individualized treatment plan and consistent with the least drastic means principle.

These statutory provisions were in effect at the time of Mr. Garcia's commitment.

In general terms, they require that medication cannot be administered unless necessary for treatment.

### B. Procedural Rights

Next, we must determine what procedure is required by the federal Constitution to protect these substantive rights. In *Harper*, a 1990 decision, the United States Supreme Court held that the due process clause was satisfied by forbidding involuntary administration of antipsychotic drugs to a prison inmate until there was compliance with various procedural safeguards, including an adversary hearing before a special committee composed of three experts who had not been involved in the inmate's treatment or diagnosis. The Court did not, however, state that those procedures were required by due process.

More importantly for the purposes of defendants' claim of qualified immunity, any constitutional requirement for such an adversary proceeding was not clear at the time of Mr. Garcia's commitment. In *Johnson v. Silvers*, 742 F.2d 823 (4th Cir. 1984), the plaintiff, an involuntarily-committed patient in a mental institution, sued a doctor under Section 1983 for forcing him to take antipsychotic medication. The court ruled, "[Plaintiff], in order to prevail, must show that the properly identified defendant has required him to take anti-psychotic drugs without exercising professional judgment." *Id.* at 825. The opinion concluded by stating that the determination of whether the deprivation of liberty in causing plaintiff to take anti-psychotic drugs against his will violated due process of law, "is to be decided under the 'professional judgment in fact exercised,' test of *Youngberg* [*v. Romeo*, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982)]." *Id.* Thus, it appears that in 1984 no more was clearly required than the exercise of professional judgment.

In our view, no less was required either. *Youngberg*, which considered the liberty interests in safety and freedom from bodily restrain of an involuntarily committed mentally retarded individual, said, "[L]iability may be imposed only when the decision by the professional is such a substantial de-

parture from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." 457 U.S. at 323, 102 S.Ct. at 2462. Although the situation in *Youngberg* is not identical to the one presented here, it is closely analogous, and we know of no post-*Youngberg* authority suggesting that professional judgment is not required by due process when psychotropic drugs are administered involuntarily.

Defendants allege in their brief, "[I]t is uncontroverted that professional judgment was exercised in [Mr. Garcia's] case during his emergency detention, and that his treatment was based upon accepted medical practices." Yet they do not cite anything in the record to support that claim. We need not address at this juncture precisely what "professional judgment" means, except to note that *Youngberg* suggested that, at least for some purposes, one trained in nursing would be a "professional" decisionmaker, and even persons without formal training could meet the test in dealing with certain "day-to-day decisions." *Id.* at 323 n. 30, 102 S.Ct. at 2462 n. 30.

We reverse the summary judgment with respect to this allegation.

## V. CONCLUSION

For the above-stated reasons, (1) we affirm the grant of summary judgment with respect to all defendants except Dr. Brooks and Dr. Wong; (2) we affirm the grant of summary judgment with respect to Dr. Brooks and Dr. Wong except with respect to the allegations that (a) Mr. Garcia was beaten and subjected to other physical abuse and (b) he was improperly injected with Haldol prior to being examined by Dr. Brooks; and (3) we reverse the district court's denial of summary judgment in favor of the Las Vegas Medical Center.

IT IS SO ORDERED.

APODACA and CHAVEZ, JJ., concur.