PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

Nos. 13-4255 & 13-4405

_____

DISABILITY RIGHTS NEW JERSEY, INC.,
A New Jersey Nonprofit Corporation

v.

COMMISSIONER, NEW JERSEY DEPARTMENT OF
HUMAN SERVICES; COMMISSIONER, NEW JERSEY
DEPARTMENT OF HEALTH AND SENIOR SERVICES;
STATE OF NEW JERSEY

Disability Rights New Jersey, Inc.,
Appellant in No. 13-4255

Commissioner, New Jersey Department
of Human Services; State of New Jersey,
Appellants in No. 13-4405

_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 10-cv-03950)
District Judge:  Honorable Dickinson R. Debevoise

_____

Argued November 18, 2014
Before: SMITH, HARDIMAN and BARRY, *Circuit Judges*.

(Filed: August 4, 2015)

Nathan S. Mammen (Argued)
John C. O'Quinn
Kirkland & Ellis
655 15th Street, N.W.
Suite 1200
Washington, DC 20005

William E. Dwyer
Disability Rights New Jersey
210 South Broad Street, 3rd Floor
Trenton, NJ 08608

David E. Myre
Samara L. Penn
Kirkland & Ellis
601 Lexington Avenue
New York, NY 10022
 *Attorneys for Appellant/Cross-Appellee Disability*
 *Rights New Jersey, Inc.*

Stuart M. Feinblatt (Argued)
Gerard A. Hughes
Office of Attorney General of New Jersey
25 Market Street
Richard J. Hughes Justice Complex
Trenton, NJ 08625
 *Attorneys for Appellees/Cross-Appellants State of New*
 *Jersey et al.*

---

OPINION OF THE COURT

---

HARDIMAN, *Circuit Judge*.

These cross-appeals require us to decide whether mentally ill residents of New Jersey who have been committed to state custody are entitled to judicial process before they may be forcibly medicated in nonemergency situations. At issue is Administrative Bulletin 5:04B, a procedure regulating the forcible administration of psychotropic drugs in New Jersey psychiatric hospitals, and its validity under the Americans with Disabilities Act and the United States Constitution. The District Court held that AB 5:04B is valid, except as to patients who have been found by a court not to require continued commitment but who remain in custody pending transfer. *Disability Rights N.J., Inc. v. Velez*, 974 F. Supp. 2d 705 (D.N.J. 2013). We will affirm the result reached by the District Court, though not for all its stated reasons.

## I

### A

The New Jersey Department of Human Services operates four psychiatric hospitals that house civilly committed adults and those who have been found incompetent to stand trial or not guilty by reason of insanity. *See* N.J. Stat. Ann. § 30:1-7. Temporary civil commitment may be ordered by a New Jersey court only upon a showing of probable cause to believe that the person is "in need of involuntary commitment to treatment," *id.* § 30:4-27.10(g),

which means that he is dangerous to himself, others, or property by reason of mental illness and is unwilling to accept treatment voluntarily, *id.* § 30:4-27.2(m). Within 20 days of the patient's initial admission to a facility, the court must hold a final commitment hearing at which the State must make the same showing by clear and convincing evidence in order to prolong the commitment. *Id.* § 30:4-27.15(a); N.J. Ct. R. 4:74-7(c)(1).

The final hearings occur at New Jersey's psychiatric hospitals but have many of the trappings of conventional judicial proceedings. Each patient has the right to be represented by counsel, to be present at the hearing, to present evidence, and to cross-examine witnesses. N.J. Stat. Ann. § 30:4-27.14; N.J. Ct. R. 4:74-7(e). A psychiatrist on the patient's treatment team who has examined the patient within five days of the hearing must testify. N.J. Ct. R. 4:74-7(e). Commitment hearings take place one or two days per week at each hospital, and most are uncontested and brief.

If a patient is committed, his status is subject to judicial review three months after the final hearing and periodically thereafter. N.J. Stat. Ann. § 30:4-27.16(a). At every review hearing, the State is required to prove by clear and convincing evidence that the involuntary commitment standard remains satisfied. *Id.* If the court concludes that the patient no longer requires commitment, it can order him discharged or enter a judgment of "conditional extension pending placement" (CEPP). N.J. Ct. R. 4:74-7(h)(1)–(2). Patients on CEPP status remain in the hospital only because an appropriate alternative placement is unavailable; their status is reviewed within 60 days of the CEPP order's issuance and then periodically at intervals no longer than six months. N.J. Ct. R. 4:74-7(h)(2).

4

B

The recent history of civil commitment of the mentally ill in this country is inextricably linked with the development of psychotropic drugs—antipsychotics, antidepressants, mood stabilizers, and the like. According to an expert report submitted to the District Court, effective psychotropic medications emerged in the 1950s and "rapidly became a mainstay of treatment" in psychiatric hospitals "because of their effectiveness in reducing or eliminating psychotic symptoms, including delusions, hallucinations, disordered thinking and speech, and disruptive and aggressive behavior." App. 468 (report of Dr. Paul S. Appelbaum). Witnesses testified that the proper use of psychotropic drugs is "an almost essential component of treatment for a patient who is severely enough disturbed to require involuntary hospitalization," App. 765, and agreed that "psychotropic medications are almost universally a part of successful treatment for patients in psychiatric hospitals," App. 781.

For all their benefits, psychotropic drugs can cause serious side effects, including muscle cramps, dizziness, metabolic syndrome, parkinsonism, akathesia (motor restlessness), dystonia (involuntary muscle contractions), and tardive dyskinesia (involuntary movement of the limbs or facial muscles). Disability Rights alleges that side effects that have been observed in New Jersey's psychiatric hospitals include fatigue, difficulty walking, confusion, anxiety, sexual dysfunction, and allergic or toxic reactions to the drugs. For these reasons (and perhaps others), significant numbers of civilly committed psychiatric patients refuse to take psychotropic medication voluntarily, however beneficial it might be from a clinical perspective. In 2011 and 2012,

5

between 29 and 48 patients were on "refusing status" and subject to forcible medication at each of the State's four psychiatric hospitals. App. 1144.

The Supreme Court has never decided whether civilly committed individuals have a constitutional right to refuse psychotropic drugs. It issued a writ of certiorari in 1981 in a case posing this question, but an intervening state court decision ultimately prevented the Court from reaching the merits. *Mills v. Rogers*, 457 U.S. 291 (1982). And although the Court has spoken time and again on the right to refuse unwanted treatment generally, it has not addressed this issue in the civil commitment context. *See, e.g.*, *Sell v. United States*, 539 U.S. 166 (2003) (concerning the right of a criminal defendant to refuse antipsychotic medication intended to render him competent to stand trial); *Washington v. Harper*, 494 U.S. 210 (1990) (concerning the due process rights of prisoners subject to forcible medication for mental illness); *Parham v. J. R.*, 442 U.S. 584 (1979) (concerning the due process rights of children institutionalized for mental health care). In *Harper*, the most relevant of these cases for our purposes, the Court held that the Due Process Clause permits a State to forcibly medicate a dangerous, mentally ill prisoner without providing a judicial hearing as long as certain "essential procedural protections" are provided. 494 U.S. at 236.

Unlike the Supreme Court, we have squarely addressed the right of civilly committed psychiatric patients to refuse psychotropic drugs. In 1977, a man involuntarily committed to a psychiatric hospital in New Jersey filed suit in federal court challenging the State's use of forcible medication in nonemergency situations. *Rennie v. Klein*, 462 F. Supp. 1131, 1134 (D.N.J. 1978). Shortly thereafter, New

6

Jersey adopted Administrative Bulletin 78-3, which became known as the "*Rennie* process" and generally consisted of three steps:

> [1] At the first level, when a patient refuses to accept medication, the treating physician must explain to the patient the nature of his condition, the rationale for using the particular drug, and the risks or benefits of it as well as those of alternative treatments. [2] If the patient still declines, the matter is discussed at a meeting of the patient's treatment team, which is composed of the treating physician and other hospital personnel, such as psychologists, social workers, and nurses who have regular contact with the patient. The patient is to be present at this meeting if his condition permits.

> [3] If, after the team meeting, the impasse remains, the medical director of the hospital or his designee must personally examine the patient and review the record. In the event the director agrees with the physician's assessment of the need for involuntary treatment, medication may then be administered. The medical director is also authorized, but not required, to retain an independent psychiatrist to evaluate the patient's need for medication. Finally, the director is required to make a weekly review of the treatment program of each patient who is being drugged against his will to determine whether the compulsory treatment is still necessary.

*Rennie v. Klein* (*Rennie I*), 653 F.2d 836, 848–49 (3d Cir. 1981) (en banc) (citations omitted), *judgment vacated and remanded*, 458 U.S. 1119 (1982). We upheld this procedure in *Rennie I*, *id.* at 851–52, and then upheld it again in *Rennie v. Klein* (*Rennie II*), 720 F.2d 266 (3d Cir. 1983) (en banc), after the Supreme Court vacated the judgment in *Rennie I* and remanded the matter for further consideration in light of *Youngberg v. Romeo*, 457 U.S. 307 (1982). We essentially held in the *Rennie* cases that civilly committed psychiatric patients "have a qualified constitutional right to refuse antipsychotic medication" in nonemergency situations and "the procedures set forth in Administrative Bulletin 78-3 accommodate [that right] in a manner consistent with the Due Process Clause." *Rennie II*, 720 F.2d at 272 (Seitz, C.J., concurring). Notably, we indicated in *Rennie I* that committed individuals are entitled to at least as much constitutional protection in this context as prisoners. *See* 653 F.2d at 845–46. The *Rennie* process was incorporated into a consent order entered by the District Court in August 1984 that governed the forcible medication of the mentally ill in New Jersey for almost 30 years.

C

Disability Rights New Jersey, a nonprofit organization that advocates for the disabled, filed a complaint in August 2010 in the District Court against New Jersey and the Commissioner of the New Jersey Department of Human Services, alleging that the *Rennie* process violated various provisions of the United States Constitution, as well as the ADA and the Rehabilitation Act of 1973. The crux of the suit was that the *Rennie* process was nothing more than a "rubber stamp" for hospital staff members who wished to forcibly medicate their patients, App. 111 (Compl. ¶ 85), though

Disability Rights also alleged that New Jersey's hospitals failed to properly comply with the procedure. As amended, the complaint requested declaratory and injunctive relief invalidating the *Rennie* process and ordering the State to provide judicial hearings before involuntarily committed psychiatric patients could be forcibly medicated in nonemergent situations. The complaint also demanded additional procedural protections accompanying a judicial hearing, including: a requirement that nonemergent forcible medication take place only after a finding that the patient is incompetent to make medical decisions; a right to counsel at the hearing; establishment of a system of "experienced and knowledgeable" counsel to advocate for patients' interests; a right to have independent expert witnesses appointed; imposition of a "clear and convincing evidence" burden of proof in forcible medication proceedings; assurance that hospital staff would be properly trained in the administration of psychotropic drugs; and a requirement that the State report monthly to Disability Rights on its use of psychotropic medication in psychiatric hospitals. App. 321–22 (Am. Compl. ¶ 6). In sum, Disability Rights demanded that the State "provide patients who refuse the non-emergency administration of psychotropic medication with meaningful due process protections—including legal counsel, notice and a hearing before a judicial decision-maker—before such persons may be involuntarily medicated." App. 248 (Am. Compl. ¶ 11).

The State moved to dismiss and argued that Disability Rights' claims were precluded by our decisions in the *Rennie* cases, but the District Court disagreed. *Disability Rights N.J., Inc. v. Velez*, 2011 WL 2976849, at *6–11 (D.N.J. July 20, 2011). The Court observed that *Rennie I* "specifically held that the involuntarily committed patients were to be accorded

9

no fewer constitutional protections than prisoners," *id.* at *9 (citing 653 F.2d at 846), and the Supreme Court held in *Harper* (several years after *Rennie*) that mentally ill prisoners facing forcible medication were entitled to procedural protections that "dwarf[ed]" what the *Rennie* process provided, *id.* at *10. After the District Court denied most of the motion to dismiss, the State moved to vacate the 1984 *Rennie* consent order, and the Court obliged in March 2012.

In June 2012, while Disability Rights' lawsuit remained pending, the State replaced the *Rennie* process with two separate policies for forcible treatment in emergencies (AB 5:04A) and nonemergent situations (AB 5:04B). Under the emergency procedure of AB 5:04A, which Disability Rights has not challenged, a patient who "presents a risk of imminent or reasonably impending harm or danger to self or others" can be forcibly medicated for up to 72 hours unless a less restrictive alternative method is available. App. 1423, 1425. The patient must be reassessed every 24 hours to determine whether the emergency persists.

The nonemergency policy challenged here, AB 5:04B (the Policy), imposes more stringent requirements because it permits longer-term forcible medication. The Policy provides that a psychiatric patient can be forcibly medicated only if he has been involuntarily committed, "has been diagnosed with a mental illness, and, as a result of mental illness, poses a likelihood of serious harm to self, others, or property if psychotropic medication is not administered[.]" App. 1393. This means that there must be a "substantial risk" that the patient will do physical harm to himself, another person, or property "within the reasonably foreseeable future." App. 1396. A risk of harm to self must be indicated by "threats or attempts to commit suicide, or to inflict physical harm on

10

one's self, or by such severe self-neglect as evidenced by a dangerous deterioration in essential functioning and repeated and escalating loss of cognitive and volitional control as is essential for the individual's health and safety"; a risk of harm to others must be indicated by "behavior which has caused [physical] harm or which places another person or persons in reasonable fear of sustaining such harm"; and a risk of harm to property must be indicated by "behavior which has caused substantial loss or damage to property." *Id.*

Patients thought to satisfy the substantive requirements of the Policy may be forcibly medicated only pursuant to procedures that, though extensive, stop short of prior judicial review. First, the patient's treating physician must complete an involuntary medication administration report, which documents the patient's diagnosis, the medication and dosage contemplated, the rationale for concluding that the patient satisfies the substantive standard outlined above, the less restrictive alternatives considered and rejected, the efforts made to explain to the patient the need for medication, and any objections expressed by the patient. Next, the hospital's medical director appoints a three-person panel chaired by a psychiatrist who may be a hospital employee but who may not be currently involved in the patient's treatment. The other members of the panel must be a hospital administrator and a clinician, neither of whom may be currently involved in the patient's treatment.

At a medication review hearing held on the patient's ward within five days of the involuntary medication administration report being submitted to the medical director, the panel hears evidence to determine whether to approve involuntary medication. The patient has the right to be notified of the hearing, attend the hearing, testify, present

11

evidence and witnesses, cross-examine witnesses, and have a mental health professional or legal counsel present (at the patient's expense). The patient is also afforded the assistance of the hospital's client services advocate, a psychiatric nurse who consults with the patient and assists him in presenting evidence and making objections at the hearing. After the hearing, involuntary medication will be authorized only if the chair and at least one other member of the panel agree that the substantive standard is satisfied. The patient has 24 hours to appeal the panel's decision to the medical director, and administration of the medication can begin immediately if the panel's decision is affirmed. Any further appeal must be made to the Appellate Division of the New Jersey Superior Court. *See* N.J. Ct. R. 2:2-3(a)(2).

The initial approval of forcible medication is valid for 14 days. Within 12 days of that approval, the treating psychiatrist must report on "the patient's positive and negative responses to the medication, what less restrictive interventions have been attempted or ruled out, and whether the patient is continuing to withhold consent." App. 1400. A panel—which need not comprise the same people as before—may then authorize forcible medication lasting up to 90 days. Throughout that period, the treating prescriber must submit biweekly reports to the medical director detailing the patient's progress. If, at the end of 90 days, the patient still does not consent to medication, the hospital must start the entire process over again in order to continue the forcible medication.

The Policy applies to all involuntarily committed psychiatric patients in New Jersey—including CEPP patients, though the State says it has been invoked against them "very rarely." N.J. Br. 69 n.14. In 255 total medication review

hearings held during the six months following the Policy's implementation, panels approved medication in all but six cases, and medical directors affirmed in 55 out of 56 appeals. App. 2658. In the District Court, Disability Rights attributed this near-uniformity at least in part to the hospitals' noncompliance with various components of the Policy and reliance on weak and stale evidence of dangerousness.

## II

New Jersey's replacement of the *Rennie* process with the Policy did not resolve the litigation because the Policy did not go as far as Disability Rights requested in its complaint. For example, the Policy did not require premedication judicial process, a "clear and convincing" showing of incompetence, a right to counsel in medication review proceedings, or a right to appointed experts. *See supra* Section I-C. In November 2012, the parties filed cross-motions for summary judgment. At that point, the District Court had before it Disability Rights' claims that the Policy on its face[1] violated the ADA, the Rehabilitation Act, and the Due Process Clause of the Fourteenth Amendment (encompassing due process

---

[1] Although Disability Rights has repeatedly asserted during this litigation that the State has failed to consistently comply with its nonemergency forcible medication policies, it has done this to point up the policies' shortcomings rather than to raise any as-applied claims. *See, e.g.*, App. 459–60 ("DRNJ admits that it challenges the [c]onstitutionality of [AB 5:04B] . . . . In pursuing this claim, however, DRNJ does not foreclose itself . . . from asserting that Defendants are failing to follow the New Policy. DRNJ admits that it is not challenging medical treatment decisions for any individual patients.").

generally, the right of access to the courts, the right to counsel, and the incorporated First Amendment right to freely think and communicate).[2] *See Disability Rights*, 974 F. Supp. 2d at 711.

The District Court held that the Policy withstood Disability Rights' statutory and constitutional challenges, except with respect to CEPP patients. As to non-CEPP patients, the Court rejected Disability Rights' ADA and Rehabilitation Act claims on two grounds: first, that the Policy is a "legitimate safety requirement" permitted by federal regulation, *id.* at 739 (citing 28 C.F.R. § 35.130(h)); and second, that "'adequate justification' exists for differential treatment of the relevant class because the treatment is not based on disability, but based on a finding of dangerousness," *id.* (quoting *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 612 (1999) (Kennedy, J., concurring in judgment)). As to CEPP patients, however, the Court granted summary judgment to Disability Rights on the statutory claims because those patients have already been found by a court of law not to be dangerous, and any "volatility" or relapse into dangerousness could be addressed using the emergency provisions of AB 5:04A or the recommitment process. *Id.* at 738.

The due process inquiry yielded the same results. With respect to non-CEPP patients, the District Court concluded that the Supreme Court's analysis of the due process rights of prisoners in *Harper* required a decision in New Jersey's

---

[2] The District Court dismissed a claim arising under the Equal Protection Clause of the Fourteenth Amendment in 2011. *Disability Rights*, 2011 WL 2976849, at *15–16. Disability Rights did not appeal that decision.

14

favor. The Court concluded that the Policy and the procedure upheld in *Harper* are "strikingly similar" and applied the logic of that decision to the civil commitment context. *Id.* at 724, 728. Again, the Court declined to extend this ruling to CEPP patients, holding that the State had "no interest in continuing to forcibly medicate" such people after they have been adjudicated not to be dangerous. *Id.* at 729. As for Disability Rights' claims based on the right to counsel, the right of access to the courts, and the right to think and communicate freely, the Court held that these claims were either duplicative of the general due process claim or could be resolved on the same grounds. *See id.* at 728, 729 n.9.

Having found the Policy valid except as to CEPP patients, the District Court enjoined New Jersey's hospitals from using it to forcibly medicate CEPP patients but otherwise let it stand. *See id.* at 740. Disability Rights filed a timely notice of appeal, and the State followed with a timely cross-appeal.

## III

The District Court had jurisdiction under 28 U.S.C. §§ 1331 and 1343(a). We have jurisdiction to review the District Court's summary judgments under 28 U.S.C. § 1291.

We review summary judgments de novo, applying the same test as the District Court. *MBIA Ins. Corp. v. Royal Indem. Co.*, 426 F.3d 204, 209 (3d Cir. 2005). Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "We may affirm a district court for any reason supported by the record." *Brightwell v. Lehman*, 637 F.3d 187, 191 (3d Cir. 2011).

IV

Title II of the ADA prohibits discrimination against the disabled in public services, programs, and activities. *Tennessee v. Lane*, 541 U.S. 509, 517 (2004). Its core provision states: "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."[3] 42 U.S.C. § 12132. To state a prima facie case, a plaintiff must show that he is a "qualified individual with a disability"; that he was excluded from a service, program, or activity of a public entity; and that he was excluded because of his disability. *Id.* Public entities include States and their subdivisions, *id.* § 12131(1), and mental illness qualifies as a disability under the statute, *id.* § 12102(1)(A).

The antidiscrimination mandate of Title II is not absolute. Federal regulations excuse States from complying with the ADA with respect to disabled people who pose a "direct threat" to others, as long as the States make these determinations using comprehensive "individualized

---

[3] Title II and its implementing regulations "incorporate[] the 'non-discrimination principles'" of the Rehabilitation Act, *Helen L. v. DiDario*, 46 F.3d 325, 331 (3d Cir. 1995), and the statutes' core provisions are substantively identical, *see* 29 U.S.C. § 794(a) ("No otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance[.]"). Hereafter we refer to the ADA alone.

assessment[s]." 28 C.F.R. § 35.139. States may also "impose legitimate safety requirements necessary for the safe operation of [their] services, programs, or activities" so long as such requirements "are based on actual risks, not on mere speculation, stereotypes, or generalizations about individuals with disabilities." *id.* § 35.130(h). Finally, the regulations permit States to avoid Title II's requirements when the modifications needed to ensure compliance would "fundamentally alter the nature of the service, program, or activity" at issue. *id.* § 35.130(b)(7).

Consistent with the District Court's opinion, New Jersey's defense of the Policy rests largely on these exceptions to Title II's antidiscrimination mandate. In our view, however, there is a dispositive threshold question: does the Policy exclude civilly committed psychiatric patients from a service, program, or activity of the State? In other words, is it actually discriminatory within the meaning of the ADA?

A

First we must determine the nature of the service, program, or activity posited by Disability Rights. At oral argument, Disability Rights limited the "service, program, or activity" from which psychiatric patients in New Jersey are allegedly excluded under the Policy to the right to judicial process before being administered medication in nonemergent situations. Yet in its briefing to the Court, Disability Rights inconsistently referred to the "service, program, or activity" as the right to refuse medical treatment. Our Court has made clear that the phrase "service, program, or activity" is extremely broad in scope and includes "anything a public entity does." *Yeskey v. Pa. Dep't of Corr.*, 118 F.3d 168, 171 (3d Cir. 1997); 28 C.F.R. § 35.130(b)(1)(vii) (Title II regulations provide that "[a] public entity, in providing any

17

aid, benefit, or service, may not, directly or through contractual, licensing, or other arrangements, . . . limit a qualified individual with a disability *in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving the aid, benefit, or service*." (emphasis added)). Although we assume that the right to refuse medical treatment (or another such right, whether it be common-law or statutory) could be a service, program, or activity within the meaning of Title II, this is not the service, program, or activity posited by Disability Rights.

Disability Rights' briefs betray considerable confusion over the nature of the service, program, or activity in question. At two pages of its opening brief, for example, Disability Rights indicates that the relevant service, program, or activity is the right to refuse treatment. *See, e.g.*, Disability Rights Br. 22, 26. In between those statements, it contends that the service, program, or activity is New Jersey's "provision of a wide range of medical services for persons with and without disabilities." *Id.* at 23. Still other parts suggest that the service, program, or activity is actually the use of judicial process prior to forcible medication. *See, e.g.*, *id.* at 1 ("[AB 5:04B] permits the State to override the most fundamental right of a person to be free of unwanted medical treatment . . . *without any court authorization or supervision*." (emphasis added)); Disability Rights Reply Br. 13–14 ("The issue here is whether the State can subject involuntarily committed persons with mental illness to *special non-judicial procedures*, taking away on 'dangerousness' grounds their right to refuse treatment for mental illness when no other person and no other type of illness (even if it is a dangerous illness) is subjected to this type of restriction." (emphasis added)); *id.* at 23 ("The discrimination is evident from the face of AB 5:04B, because it only takes away the right of

18

persons with mental illness to refuse medical treatment, while all other persons—regardless of their disease—retain the right to refuse treatment *absent a court order requiring otherwise*." (emphasis added)). The same confusion is evident in Disability Rights' memorandum in opposition to the State's motion for summary judgment. *Compare* App. 2375–76 (describing the service, program, or activity as either the right to refuse treatment or the provision of medical services) *with* App. 2378 ("DRNJ does not dispute that psychotropic medication may be an important—even necessary—part of any individual patient's treatment plan. However, this issue is factually and legally distinct from the necessity of a disparately applied *policy* permitting the forcible medication without a hearing and without representation." (emphasis in original)).

This ambiguity prompted the Court to inquire about the identity of the relevant service, program, or activity at oral argument. Disability Rights cabined the service, program, or activity in question as a premedication judicial process:

| The Court: | What is the service[,] program or activity of the state from which your clients are excluded? |
|---|---|
| Disability Rights: | The service[,] program or activity would be the right to refuse treatment that will not be overcome by a judicial hearing, only by a judicial hearing. |

. . . .

| | |
|---|---|
| The Court: | Please define as succinctly and slowly as you can—because I think this is critical for the ADA claim—what is the service[,] program or activity[?] You started by saying it's a process. . . . What process? |
| Disability Rights: | A judicial hearing. |
| The Court: | Okay. . . . All right. Then it's not about forcible medication. You agree that people can be forcibly medicated, but you say [they] can't be forcibly medicated unless they have a judicial hearing. |
| Disability Rights: | Correct. |

Tr. of Oral Arg. at 17–18. Other representations by Disability Rights during oral argument demonstrate that the relevant service, program, or activity is not the right to refuse treatment in general, but instead premedication judicial process. *See, e.g.*, *id.* at 3 ("This case is about whether the state of New Jersey can, in the absence of an emergency, forcibly medicate competent persons in the state mental hospitals without a judicial hearing when no other group, no other illness can be forcibly treated without a judicial hearing."); *id.* at 16 ("And the process is key to providing these individuals the same rights that every other person enjoys, which goes to our ADA argument, that every other person in New Jersey will not have the right to refuse treatment overridden absent a court order."); *id.* at 45 ("[T]he

20

issue is not that no other person is being forcibly medicated. It's that if the state wants to forcibly medicate those individuals with those illnesses, they have to follow the process with a judicial hearing."). These representations are consistent with the relief requested in Disability Rights' amended complaint. *See* App. 321–22 (requesting as relief, *inter alia*, a "plan and schedule" to ensure that patients refusing to consent to the administration of psychotropic drugs receive a "judicial hearing," "representation by counsel at said hearing," a system for "appointing experienced and knowledgeable counsel," appointing "independent expert witnesses" for patients, and requiring a "clear and convincing evidence" standard of proof for involuntary medication).

Courts routinely invite litigants to clarify their positions and legal theories at oral argument, and when litigants accept such invitations, courts routinely hold them to their representations. *See, e.g.*, *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005) (recognizing a party's withdrawal of a concession at argument); *Frisby v. Schultz*, 487 U.S. 474, 483 (1988) (construing a municipal ordinance narrowly in accordance with the view expressed by the municipality during argument); *Coar v. Kazimir*, 990 F.2d 1413, 1415 n.2 (3d Cir. 1993) (narrowing the scope of the dispute at issue based on a party's representations at argument). We accept at face value Disability Rights' assertions during oral argument that the relevant service, program, or activity is the right to premedication judicial process.

And it is proper to hold Disability Rights to its word because there is significant evidence that the service, program, or activity at issue in this case is, in fact, procedural in nature. As a general matter, the scope of a remedy for a violation of law is necessarily limited by the scope of the law

21

itself. *See, e.g.*, *Missouri v. Jenkins*, 515 U.S. 70, 88 (1995) ("The nature of the . . . remedy is to be determined by the nature and scope of the constitutional violation." (internal quotation marks omitted)). In the context of a Title II case, the equitable remedy sought is generally an injunction requiring the defendant public entity to give the disabled plaintiff "meaningful access" to the service, program, or activity from which he has unlawfully been excluded on the basis of his disability. *See, e.g.*, *Lonberg v. City of Riverside*, 571 F.3d 846, 851 (9th Cir. 2009) ("[Title II's] prohibition against discrimination is universally understood as a requirement to provide 'meaningful access.'"); *Henrietta D. v. Bloomberg*, 331 F.3d 261, 282 (2d Cir. 2003) (noting that a "reasonable accommodation" is one that gives an otherwise qualified plaintiff with a disability "meaningful access" to the program or service sought). In other words, there is a nexus between the remedy sought and the service, program, or activity.

Here, there is no debate that the remedy demanded by Disability Rights is an order requiring New Jersey to provide judicial hearings (and associated procedural protections) prior to nonemergent forcible medication. Where, as here, a party clearly articulates the remedy sought but offers shifting or perhaps ambiguous indications as to the corresponding service, program, or activity, we can (and should) infer from that remedy the true identity of the service, program, or activity. *See, e.g.*, *Yeskey*, 118 F.3d at 169–72 (holding that a prison "boot camp" program qualified as an service, program, or activity after a disabled prisoner sued to be allowed to participate), *aff'd*, 524 U.S. 206 (1998). The undisputed fact that Disability Rights seeks only a procedural remedy is thus compelling evidence that the service, program, or activity is procedural too.

We have determined—by looking to the briefs, the record, and oral argument—the nature of the claim Disability Rights itself chose to pursue. A party's confusion over the contours of its own claim (whether inadvertent or strategic) does not excuse a court from construing it. And there is surely a difference between "constru[ing] ambiguous filings to make sense out of them," as we do here, and "recharacterizing" a claim in order to give it a better chance of success. *Mata v. Lynch*, 135 S. Ct. 2150, 2157 (Thomas, J., dissenting). We therefore proceed on the understanding that the relevant service, program, or activity for purposes of the ADA claim is the right to judicial process before medication is forcibly administered in nonemergent situations.

B

The fatal defect in Disability Rights' ADA claim is that this right does not exist in New Jersey for nondisabled people, which means the denial of that right to psychiatric patients is not discriminatory. All New Jersey citizens are entitled to the judicial processes attendant to civil commitment. After that point, however, and once an individual's care is entrusted to the State, there are no additional premedication judicial processes available to anyone. In fact, Disability Rights repeatedly states in its opening brief that no one in the State but civilly committed psychiatric patients is subject to forcible medication at all. *See, e.g.*, Disability Rights Br. 1 ("Notably, the State cannot forcibly treat persons with other illnesses without their consent, even if the State unequivocally believes those persons 'need' the treatment to get better."); *id.* at 25 ("AB 5:04B deprives persons with mental illness in state psychiatric hospitals of the right to refuse medical treatment even though persons without mental illness retain their right

23

to refuse treatment[.]"). Our own review of New Jersey law persuades us that Disability Rights is basically correct. For example, mentally ill prisoners are subject to forcible medication, but they are entitled only to procedures that closely track the Policy. *See* N.J. Admin. Code § 10A:16-11.1 *et seq.* Beyond prisoners and the civilly committed, New Jersey law broadly protects the right of hospital patients to refuse medication and treatment. *See id.* § 8:43G-4.1(a)(8). The nonexistent provision of specific procedural protections before such forcible treatment occurs cannot be a service, program, or activity of the State.

In its reply brief, Disability Rights suggests that some other New Jerseyans *are* subject to court-ordered treatment without their consent. *See, e.g.*, Disability Rights Reply Br. 6 ("New Jersey courts consistently have held that legally competent adults have the right to refuse unwanted medical treatment, except in rare instances of an overriding court order."). And, indeed, New Jersey law allows courts to order incompetent or incapacitated—*i.e.*, disabled—people to undergo certain forms of medical treatment even though they are incapable of consenting. *See, e.g.*, N.J. Stat. Ann. § 30:4-24.2(d)(2) (allowing courts to order necessary "experimental research, shock treatment, psychosurgery or sterilization" of psychiatric patients adjudicated to be incapacitated); *Matter of Jobes*, 529 A.2d 434, 451 (N.J. 1987) (suggesting that judicial action can sometimes forestall the withdrawal of life-sustaining treatment from incompetent patients whose wishes are unknown).

But even if we set aside the critical distinctions between such scenarios and the treatment program at issue here, New Jersey's provision of judicial process in those circumstances does not establish actionable discrimination

24

under the ADA in this case. The fact that other disabled people in the State may be entitled to judicial process before they are treated without their consent does not mean New Jersey violates the ADA by forcibly medicating psychiatric patients under the Policy. The ADA does not require procedural uniformity in all public efforts to deal with the various challenges associated with caring for the disabled. In *Traynor v. Turnage*, the Supreme Court held that "nothing in the Rehabilitation Act"—which, as we have discussed, substantively parallels Title II—"requires that any benefit extended to one category of handicapped persons also be extended to all other categories of handicapped persons." 485 U.S. 535, 549 (1988); *see also Ford v. Schering-Plough Corp.*, 145 F.3d 601, 608 (3d Cir. 1998) ("The ADA does not require equal coverage for every type of disability[.]"); Nondiscrimination on the Basis of Disability in State and Local Government Services, 56 Fed. Reg. 35,694, 35,705 (July 26, 1991) ("State and local governments may provide special benefits . . . that are limited to individuals with disabilities or a particular class of individuals with disabilities[] without thereby incurring additional obligations to persons without disabilities or to other classes of individuals with disabilities." (discussing 28 C.F.R. § 35.130(c))). The mere fact that a State's law provides for judicial process before certain disabled people can be medically treated without their informed consent does not mean the State must follow identical procedures when it permits other disabled people to be treated against their will. In short, Disability Rights has not cited and we are unaware of any case holding that a Title II violation can be stated in the absence of an allegation that a qualified person with a

25

disability has been denied access to a public service, program, or activity to which nondisabled people have access.[4]

In support of its ADA claim, Disability Rights leans heavily upon *Hargrave v. Vermont*, in which the Court of Appeals for the Second Circuit held that a Vermont statute violated Title II. 340 F.3d 27 (2d Cir. 2003). The statute at issue altered Vermont law relating to the durable power of attorney for health care (DPOA), a document that appoints a guardian to make health-care decisions in the event of the executor's incapacity and "articulat[es] preferences for or limitations on treatment." *Hargrave*, 340 F.3d at 31. Prior to the law, a DPOA could be revoked only by the executor himself or by a probate court in conjunction with the appointment of a guardian for the executor. *Id.* The law

---

[4] The only apparent exception to this rule arises in the context of unnecessary institutionalization, which is not the conduct at issue here. *See Olmstead*, 527 U.S. at 598 (holding that unjustified institutionalization of disabled people who are qualified for noninstitutional care can violate Title II even when no nondisabled people are given preferential treatment); *Helen L.*, 46 F.3d at 332–33. Significantly, these cases rely on the "integration mandate," a regulation obligating States to administer services in the "most integrated setting appropriate to the needs of qualified individuals with disabilities" and effectively defining unnecessary institutionalization as a form of discrimination under Title II. 28 C.F.R. § 35.130(d). Disability Rights neither invokes the integration mandate nor identifies anything in the ADA or its implementing regulations providing that a State's procedural inconsistency in confronting different disability-related issues was a problem Congress intended to eliminate.

authorized health care professionals at state psychiatric hospitals to petition a court to override a civilly committed person's DPOA to permit forcible medication in nonemergency situations. *See id.* Nancy Hargrave, an involuntarily committed woman suffering from schizophrenia, sued to enjoin enforcement of the law after being forcibly medicated and executing a DPOA refusing further treatment with "any and all anti-psychotic, neuroleptic, psychotropic or psychoactive medications." *Id.* at 32 (internal quotation marks omitted).

In holding that the law violated Title II, the Second Circuit concluded that it unlawfully discriminated against mentally ill people by enabling Vermont to override their refusal of medical treatment, a power the State could not exert over others. *Id.* at 38 (characterizing the relevant service, program, or activity as "the statutorily created opportunity to execute a DPOA for health care and the right *to have it recognized and followed*" (internal quotation marks omitted)). Hargrave identified a service, program, or activity that was made available to everyone (*i.e.,* Vermont's policy of recognizing DPOAs that could not be overridden on the motion of a doctor) and alleged that she had been excluded therefrom because of her disability. Conversely, here Disability Rights posits a service, program, or activity (the use of judicial hearings and attendant procedural protections prior to nonemergency forcible medication) that does not exist for any nondisabled people. *Hargrave* thus supports our view that a Title II claim must allege that a disabled person has been denied some benefit that a public entity has extended to nondisabled people—a burden Disability Rights does not carry here.

## C

Excusing this defect in Disability Rights' legal theory would be problematic. We note that Disability Rights would have us unravel a policy that may well be equal or superior to the judicial model it demands.[5] The State asserts that the Policy was developed at least in part with bona fide concerns for patient welfare in mind. *See* N.J. Br. 10–11. Disability Rights has not produced any evidence that judicial hearings would more effectively prevent unnecessary medication than the Policy—for example, it has not shown that psychiatric patients are medicated with appreciably less frequency in States that do provide judicial process.[6] *See* App. 298 (Am.

---

[5] In addition, allowing such a challenge could improperly transform the ADA from an antidiscrimination statute into a law regulating the quality of care the States provide to the disabled. *See Olmstead*, 527 U.S. at 603 n.14 ("We do not in this opinion hold that the ADA imposes on the States a 'standard of care' for whatever medical services they render, or that the ADA requires States to 'provide a certain level of benefits to individuals with disabilities.'"). To do so would impose "significant federalism costs" by subverting "the States' historical role as the dominant authority responsible for providing services to individuals with disabilities." *Id.* at 624–25 (Thomas, J., dissenting).

[6] At least as to non-CEPP patients, it would be surprising if judicial hearings had a significant impact on the frequency of forcible medication in New Jersey. When a New Jersey judge commits a mentally ill person to state custody, he orders "involuntary commitment *to treatment.*" N.J. Stat. Ann. § 30:4-27.10 (emphasis added). In addition, the substantive standards for involuntary commitment and

28

Compl. ¶ 147) (listing 29 States in which psychiatric patients are entitled to judicial hearings before being forcibly medicated). While it urges us to extend the coverage of Title II beyond what the statute will bear, Disability Rights also fails to show that invalidating the Policy would actually serve the interests of psychiatric patients in New Jersey.

For the reasons stated, we hold that Disability Rights has failed to allege a prima facie violation of Title II of the ADA because the provision of judicial process before the nonemergent administration of psychotropic drugs is not a "service, program, or activity" of New Jersey from which the civilly committed are excluded. Since this flaw in Disability Rights' ADA claim applies equally to CEPP and non-CEPP patients, we will affirm the District Court's summary judgment for New Jersey as to the non-CEPP patients and reverse the summary judgment for Disability Rights as to the CEPP patients on the ADA claim.

V

Having rejected Disability Rights' statutory claims, we turn now to its constitutional claims. The District Court split its analysis of the due process claim into substantive and

---

forcible medication are so strikingly similar that different results at the same patient's commitment and medication hearings are unlikely. Civil commitment requires a substantial likelihood that the person will harm himself, others, or property "within the reasonably foreseeable future." *Id.* § 30:4-27.2(h)–(i). For a person to be forcibly medicated under the Policy, there must be a "substantial risk" that, "within the reasonably foreseeable future," the patient will do "serious harm to self, others, or property if psychotropic medication is not administered[.]" App. 1393, 1396.

procedural components, but we focus on procedural due process. Because the due process analysis is different for non-CEPP and CEPP patients, we evaluate them separately.

A

As the Policy relates to non-CEPP patients, our analysis is guided by *Harper*, in which the Supreme Court held that a prison procedure virtually identical to the Policy satisfied due process. In that case, Washington State confined Harper, a convicted felon, to its Special Offender Center, a facility housing prisoners with serious mental illnesses. 494 U.S. at 214. After the State treated Harper with antipsychotic drugs against his will, Harper filed a § 1983 suit "claiming that the failure to provide a judicial hearing before the involuntary administration of antipsychotic medication" violated the Due Process Clause. *Id.* at 217. As Disability Rights admits, New Jersey's Policy is essentially identical to the Washington policy at issue in *Harper*, which required approval of forcible medication by a three-person committee accompanied by various other procedural protections. *See* Disability Rights Reply Br. 33 n.6 (resisting New Jersey's argument that the Policy is more protective by claiming that the only two differences are illusory).

The Supreme Court began its review of the Washington policy by holding that, in light of the side effects and mind-altering nature of psychotropic drugs, Harper had "a significant liberty interest in avoiding the unwanted administration of antipsychotic drugs under the Due Process Clause," *Harper*, 494 U.S. at 221, but that this interest could be outweighed in appropriate circumstances by "the State's interests in prison safety and security," *id.* at 223. It rejected the notion that the Due Process Clause forbids a State from forcibly medicating a prisoner unless he has been found to be

30

incompetent. *Id.* at 222. The Court then proceeded to consider the procedural sufficiency of the Washington policy using the balancing test of *Mathews v. Eldridge*, 424 U.S. 319 (1976). Although the Court acknowledged Harper's strong interest in refusing unwanted treatment, it rejected the notion that forcible medication decisions had to be made by judges rather than medical professionals. *See Harper*, 494 U.S. at 229–31. "The risks associated with antipsychotic drugs are for the most part medical ones, best assessed by medical professionals," the Court said. *Id.* at 233. "A State may conclude with good reason that a judicial hearing will not be as effective, as continuous, or as probing as administrative review using medical decisionmakers." *Id.* The Court also specifically dismissed Harper's complaints that the Washington policy did not require a "clear and convincing" standard of proof or the right to counsel. *Id.* at 235–36.

Attempting to distinguish *Harper*, Disability Rights insists repeatedly: "New Jersey psychiatric hospitals *are not prisons* and their patients *are not prisoners*." Disability Rights Reply Br. 30 (emphasis in original); *see also* Disability Rights Br. 2, 46, 53, 55–57. For support, it quotes caselaw holding that involuntarily committed people "are entitled to more considerate treatment and conditions of confinement than criminals." Disability Rights Br. 53 (quoting *Youngberg*, 457 U.S. at 321–22). But Disability Rights omits a critical part of the quotation from *Youngberg*: "Persons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals *whose conditions of confinement are designed to punish*," the Court wrote. 457 U.S. at 321–22 (emphasis added). It is indisputable that the Due Process Clause permits harsher treatment of prisoners than civilly committed people insofar as the harsher treatment relates to the punitive nature of incarceration. But the

Supreme Court has repeatedly stated that forcible treatment of mentally ill prisoners cannot be a component of a State's program of punishment. *See Harper*, 494 U.S. at 241 ("Forced administration of antipsychotic medication may not be used as a form of punishment."); *Vitek v. Jones*, 445 U.S. 480, 493 (1980) ("[I]nvoluntary commitment to a mental hospital is not within the range of conditions of confinement to which a prison sentence subjects an individual."). This principle is borne out by the Supreme Court's indication that the logic of *Harper* applies to the forcible medication of pretrial detainees. *See Riggins v. Nevada*, 504 U.S. 127, 135 (1992).

Because forced administration of psychotropic drugs can be used only for safety and treatment reasons in both the prison and civil commitment contexts, there is no relevant distinction between *Harper* and this case for due process purposes, at least with respect to non-CEPP patients. *See Jurasek v. Utah State Hosp.*, 158 F.3d 506, 511 (10th Cir. 1998) (rejecting a similar due process challenge to forcible medication on the ground that *Harper* applies in the civil commitment context as long as similar procedural protections are afforded). It would be passing strange if due process were to permit the State to forcibly medicate a criminal whose conviction bears no suggestion of physical dangerousness without a judicial hearing, while mandating judicial hearings for mentally ill people who have already been adjudicated to be so dangerous as to require civil commitment. Therefore, we will affirm the District Court's summary judgment in favor of New Jersey on the due process claim with respect to non-CEPP patients.

B

As for CEPP patients—individuals who have been found by a court to no longer be sufficiently dangerous to

need involuntary confinement, but who remain in custody pending transfer to an appropriate community-based placement—we agree with the District Court that the due process claim has merit. Disability Rights is correct that *Harper*, which did not address situations in which a State wishes to forcibly medicate a person who has already been adjudicated by a court to be nondangerous, does not control with respect to CEPP patients. Accordingly, we turn to the familiar *Mathews v. Eldridge* balancing test. *See Harper*, 494 U.S. at 229 (using *Mathews* to analyze procedural due process rights in the forcible medication context).

*Mathews* requires us to weigh three factors: (1) "the private interest that will be affected by the official action"; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." 424 U.S. at 335. Application of these factors persuades us to agree with the District Court that the Policy violates the Due Process Clause with respect to CEPP patients.

First, as the Supreme Court held in *Harper*, an individual's interest in avoiding the unwarranted administration of psychotropic drugs is, to say the least, "not insubstantial." 494 U.S. at 229. Psychotropic medication alters and regulates the patient's cognitive processes and can trigger serious side effects. *Id.* at 229–30. A patient's interest in avoiding such an invasion of his bodily integrity can only be greater when a court of law has already declared him fit to return to life in the community.

33

Meanwhile, the risk of erroneous results in the absence of a judicial hearing is considerably higher than in the non-CEPP context. When New Jersey applies the Policy to a CEPP patient, it effectively vacates a court's prior determination that the patient is not dangerous. Such a decision may be appropriate in some circumstances—CEPP patients are only entitled to judicial review hearings every six months after their first 60 days on CEPP status, so they have plenty of time in State custody in which to relapse into dangerousness. *See* N.J. Ct. R. 4:74-7(h)(2). But allowing the Policy to be applied to CEPP patients would permit the State to forcibly medicate a patient just a few days after a judge has deemed the patient no longer dangerous. In such circumstances, due process may require the hospital and the commitment court to agree that the basis for a previous judicial finding of nondangerousness no longer exists.

Finally, the State's interest in denying judicial process to CEPP patients seems slight. Although we disagree with the District Court's statement that the State "has no interest in continuing to forcibly medicate" CEPP patients, *Disability Rights N.J.*, 974 F. Supp. 2d at 729, New Jersey admits that it has "very rarely" sought to forcibly medicate CEPP patients pursuant to the Policy, N.J. Br. 69 n.14. For those CEPP patients who do relapse while in custody, the State may invoke AB 5:04A to address any emergency until a judicial hearing can be held. And if providing judicial process for *all* psychiatric patients would result in just a five-percent increase in hearings, as Disability Rights asserts and the State does not contest, *see* Disability Rights Br. 37, then the "fiscal or administrative burden[]" imposed on New Jersey by a judicial hearing requirement for CEPP patients would be light indeed, *Mathews*, 424 U.S. at 335.

The balance among these three factors convinces us that, as the District Court held, the State cannot apply the Policy to CEPP patients consistent with due process of law. To hold otherwise would permit psychiatric hospitals to forcibly treat patients with mind-altering drugs even after a judge has ruled that the factual basis for their continued civil commitment has disappeared. If a patient actually remains so dangerous as to require long-term, nonemergent forcible medication, the appropriate course for the State is to recommit the patient through normal judicial channels, not to leave the patient on CEPP status. We will therefore affirm the District Court's summary judgment for Disability Rights on the due process claim with respect to CEPP patients.

Our analysis effectively disposes of the constitutional claims arising under the right of access to the courts, the right to counsel, and the right to freely think and communicate. *Harper*, as discussed above, squarely rejects the first two of those claims. *See* 494 U.S. at 231 ("[W]e conclude that an inmate's interests are adequately protected, and perhaps better served, by allowing the decision to medicate to be made by medical professionals rather than a judge."); *id.* at 236 ("[I]t is less than crystal clear why *lawyers* must be available to identify possible errors in *medical* judgment." (quoting *Walters v. Nat'l Ass'n of Radiation Survivors*, 473 U.S. 305, 330 (1985))). The claim based on the right to freely think and communicate is duplicative of the general due process claim and can be resolved on the same grounds. We have long held that a civilly committed person's right to be free from unwanted treatment with mind-altering drugs is a qualified one, *see Rennie II*, 720 F.2d at 272 (Seitz, C.J., concurring), and there is no reason to think that the *Harper* hearings provided under the Policy impermissibly infringe upon that right.

\*     \*     \*

In implementing the Policy, the State of New Jersey discharged one of its most important and daunting responsibilities: the care and custody of people too mentally ill to live in freedom. New Jersey determined that, while judges have an important role to play in the civil commitment process, matters of medical treatment are more appropriately handled by medical professionals. We conclude that the State's approach comports with the demands of the Constitution and the Americans with Disabilities Act, except as to CEPP patients, whose constitutional rights entitle them to judicial process before psychotropic medication may be forcibly administered. An appropriate order follows.