STATE OF MAINE
CUMBERLAND, ss.

SUPERIOR COURT
CIVIL ACTION
DKT. NO. CV-18-470

KENNETH CAPRON,

    Plaintiff,

v.

ORDER

MAINE DEPARTMENT OF HEALTH
AND HUMAN SERVICES,

    Defendant.

REC'D CUMB CLERKS OF
FEB 19 '21 AM8:50

Before the Court is a motion by defendant Maine Department of Health and Human Services for summary judgment on Kenneth Capron's complaint alleging public accommodation discrimination against the Department under the Maine Human Rights Act (MHRA), 5 M.R.S. § 4592, and the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12101- 12213.

Like many cases, this case has been delayed by the pandemic. The deadline for dispositive motions was March 30, 2020 but that deadline was extended under the various pandemic orders. The Department filed its motion on May 1 and briefing was completed in mid-August. Since then the court has had almost no time to devote to civil proceedings due to the pandemic and the need to focus on criminal cases. The lengthy submissions in the file have also delayed the court's ability to review and decide the motion.

The court has now considered the parties' briefs, their statements of material fact, and the summary judgment record, which includes 375 pages of documents submitted by Mr. Capron along with his affidavit and Rule 56(h)(2) statement in opposition to the Department's motion. Because a motion for summary judgment is decided based solely on the summary judgment record, the court did not hold oral argument.

1

## Summary Judgment Standard

Summary judgment should be granted if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. "A material fact is one that can affect the outcome of the case, and there is a genuine issue when there is sufficient evidence for a fact-finder to choose between competing versions of the fact." *Lougee Conservancy v. CitiMortgage, Inc.*, 2012 ME 103 ¶ 11, 48 A.3d 774.

In considering a motion for summary judgment, the court is required to consider only the portions of the record referred to and the material facts set forth in the parties' Rule 56(h) statements. *E.g., Mahar v. StoneWood Transport*, 2003 ME 63 ¶ 8, 823 A.2d 540. The facts must be considered in the light most favorable to the non-moving party. *See Cormier v. Genesis Healthcare LLC*, 2015 ME 161 ¶ 7, 129 A.3d 944. Thus, for purposes of summary judgment, any factual disputes must be resolved against the movant. Nevertheless, when the facts offered by a party in opposition to summary judgment would not, if offered at trial, be sufficient to withstand a motion for judgment as a matter of law, summary judgment should be granted. *Kenny v. Department of Human Services*, 1999 ME 158 ¶ 3, 740 A.2d 560.

## Summary Judgment Submissions in This Case

The parties have appended to their summary judgment submissions and have relied on emails that were exchanged between Mr. Capron and DHHS and certain DHHS internal emails concerning Mr. Capron's requests. No objection has been raised by either party to the authenticity

2

of those emails or to their admissibility.[1]

However, the court's task in determining whether there are genuine issues of material fact precluding summary judgment has not been facilitated by the Mr. Capron's submissions. First, there is the sheer number of documents that he has submitted, the relevance of many of which to the issues before the court is not explained.

Second, Mr. Capron's memorandum of law in response to the motion for summary judgment does not cite to his Rule 56(h)(2) statement, which makes it difficult to tease out the import of the 375 pages of documentation he submitted and how those aspects of the record relate to his arguments. His response to the motion for summary judgment also appears to include some factual assertions that are not contained in his Rule 56(h)(2) statement and therefore cannot be considered by the court.

Third, many of the assertions in his opposing statement of material facts, in his statement of additional material facts, and in his affidavit consist of legal conclusions and legal argument that do not properly belong in an affidavit or a Rule 56(h) statement. *See Kitchen v. City of Calais*, 666 A.2d 77, 79 (Me. 1995); *Town of Orient v. Dwyer*, 490 A.2d 660, 662 (Me. 1985).

The court is aware that Mr. Capron is representing himself. Self-represented litigants are not entitled to special consideration and are required to comply with the rules applicable to summary judgment the same as any other party. *E.g., Dumont v. Fleet Bank*, 2000 ME 197 ¶ 13, 760 A.2d 1049. The court also understands that Mr. Capron is an individual with disabilities, and its decision below is not based on any technical noncompliance by Mr. Capron with summary judgment procedure.

---

[1] Most of those emails have Bates stamp numbers, e.g., "DHHS 000167," and in referring to emails, the court will identify them by date and will also list the Bates stamp number. References to documents submitted by Mr. Capron without any Bates stamp will be referred to by page number, e.g., "Capron 61."

3

Mr. Capron's complaint alleges that the Department discriminated against him when it denied a request he made in April 2016 for what he characterized as reasonable accommodations in light of his dementia. The specific accommodations he requested included monthly meetings with officials in the Department's Office of Aging and Disability Services (OADS), a written followup after each of those meetings, and a written acknowledgement of each email sent to the Department's Acting Commissioner. *See* Complaint ¶¶ 13-20.

While the Department's motion focuses on the facts surrounding those requests, Mr. Capron has responded by raising a lengthy history of his dealings with the Department, which include various complaints about other aspects of his treatment by the Department. Mr. Capron contends that his history with the Department reflects "a pattern of discrimination that continues today." Plaintiff's Response to Defendant's Motion for Summary Judgment dated July 31, 2020 at 3.

As set forth in the court's March 2, 2020 order, many of Mr. Capron's complaints involve actions as to which any claim of discrimination would be time-barred,[2] and the court has already ruled that the continuing violation doctrine is not applicable in this case. *See* Order dated March 2, 2020 ¶¶ 2-3. Other of Mr. Capron's complaints involve actions by the Department that Mr. Capron now claims were retaliatory. However, Mr. Capron previously stated on the record that he is not pursuing a retaliation claim. *See* Order dated March 2, 2020 ¶ 4. The court will therefore focus on the specific facts relating to the claim set forth in the complaint that Mr. Capron was denied certain reasonable accommodations.

---

[2] Mr. Capron filed his complaint before the Maine Human Rights Commission on July 18, 2016. Under 5 M.R.S. § 4611, complaints must be filed with the Commission within 300 days of the alleged act of unlawful discrimination.

## Summary Judgment Record

Mr. Capron is a person diagnosed with several medical and cognitive disabilities referred to generally as "dementia." These cognitive disabilities prompted him to serve as the volunteer Executive Director of MemoryWorks, which is an organization that provides free services to people with dementia. MemoryWorks hosts what Mr. Capron terms "Memory Cafes," which he describes as "informal gatherings when people impacted by dementia could gather without stigma to share experiences and wisdom and to support each other as able." Capron Affidavit ¶ 1.

In his role as volunteer Executive Director of MemoryWorks, Mr. Capron has been responsible for carrying out its mission statement, which makes it necessary for him to seek information from DHHS staff, particularly the Department's Office of Aging and Disability Services (OADS) with respect to OADS programs as well as Department, State, and Federal rules, regulations, and statutes. From at least 2014 Mr. Capron has had interactions with officials at DHHS on various subjects. Some of those involved whether MemoryWorks could contract with DHHS as a provider of services or could receive grants to hold conferences and events. Many of those concerned complaints he made about the implementation by DHHS of programs for the aging and allegations he made of fraud and/or mismanagement with respect to those programs.

Ricker Hamilton was the Deputy Commissioner of DHHS in 2016. Gary Wolcott was the Director of OADS in 2016. OADS is an office within the Department that supports older and disabled adults by providing adult protective, brain injury, intellectual and developmental disability, long-term care, and aging community services to the people of Maine.

In order to receive the healthcare and social services offered by the Department, including OADS, individuals must apply and meet certain eligibility criteria. The Department contracts –

5

either through a Request for Proposal process or by a sole source contract – with third-party agencies and providers to distribute these services to its clients. During 2016 neither Mr. Capron nor MemoryWorks held a contract with the Department to provide direct services to consumers of the Department's benefits, services, or programs. Mr. Capron inquired via email in 2015 about becoming a Social Adult Daycare and how to access Respite Care, but he never became a contract or paid provider of either function. Nor was Mr. Capron a client of OADS or the Department generally, meaning that he did not apply for or receive services from any of the Department's offices or programs.

In his Rule 56(h)(2) statement, Mr. Capron largely disputes the Department's assertions in the preceding paragraph, but the Department's statements are properly supported, and Mr. Capron's qualifications and denials do not controvert the substance of the Department's assertions. *See Doyle v. Department of Human Services*, 2003 ME 61 ¶ 11 & n.4, 824 A.2d 48. Instead, Mr. Capron's attempted qualifications and denials of the facts in the preceding paragraph highlight one of the key difference in the parties' characterizations of the relationship between Mr. Capron and the Department. Mr. Capron does not actually dispute that he was not receiving healthcare or social services from the Department, nor does he dispute that he was not a contract provider of services with the Department.

Rather, Mr. Capron views his relationship with the Department and OADS as someone who, as the operator of a nonprofit that helps persons for whom the Department administers services, sought administrative and informational services from the Department. He refers to himself as a "provider" within the meaning of the Department's regulations even though he does not have a contract with the Department.[3] He appears to have participated in some stakeholder

---

[3] Mr. Capron cites the definition of provider in 10-149 C.M.R. ch. 5, § 63.01 (GG) as any entity who offers or plans to offer in-home or community support services. However, "in-home or community support

6

meetings, and he has frequently raised objections and criticisms of the programs run by OADS and has also filed a number of FOAA requests.

Whether Mr. Capron has sent an inordinate number of emails to DHHS over the years is disputed, but the record reflects that he has sent DHHS more than a few emails. One of those was on December 31, 2015 (DHHS 000167), when Mr. Capron sent an email to Deputy Commissioner Hamilton that reiterated certain of his criticisms of OADS programs, particularly with respect to certain waivers provided to Area Agencies on Aging (AAA waivers). Mr. Capron refers to himself in that email as "a citizen and an advocate."

The following day, on January 1, 2016, Deputy Commissioner Hamilton emailed Mr. Capron offering to meet with him, stating that the DHHS responses to Mr. Capron's previous emails had not been effective and that he wanted "to change how we address your concerns, FOAA requests, complaints, and allegations" in the hope that the parties could move forward in a more productive and collaborative manner. (DHHS 000166).[4]

Prior to the meeting, Mr. Capron forwarded a list of topics he wished to discuss. Some of those involved MemoryWorks and whether it could qualify as a respite care provider or obtain grant funds for conferences. At the same time, Mr. Capron asked for a separate meeting to discuss AAA waivers, again referring to himself as a citizen and advocate and stating that unless there was a separate meeting relating to waivers, he would proceed "as though OADS is an adverse or hostile component of the multi-decade failure to enforce the Department rules." (DHHS 000400). Deputy

---

services" is defined as a state funded program conducted by providers operating under state-funded contracts. 10-149 C.M.R. ch. 5, § 63.01(A). As Mr. Capron concedes, neither he nor MemoryWorks have contracted with the Department to provide services nor are any of the services they provide funded by the state.

[4] Behind the scenes, however, Deputy Commissioner Hamilton displayed impatience with Mr. Capron, emphasizing in internal emails that he only intended to meet with Mr. Capron once.

Commissioner Hamilton declined a separate meeting.

In late March 2016 DHHS held a stakeholders meeting on Home and Community Based Services (HCBS). Mr. Capron contends that he was excluded from that meeting and from similar meetings. He has not offered any evidence substantiating his exclusion, and DHHS has offered evidence that notice of all public meetings of that nature was posted on its website and that Mr. Capron would have been free to attend.

Deputy Commissioner Hamilton and Director Gary Wolcott met with Mr. Capron on April 1, 2016. The tenor of the meeting is subject to dispute. In their affidavits Hamilton and Wolcott state that the meeting devolved into personal attacks by Mr. Capron. Mr. Capron, in contrast, while acknowledging that "aggressive posturing occurred by both parties,"[5] asserts that Wolcott stated at the end of the meeting that the meeting had been productive.

At the end of the meeting Mr. Capron requested to meet monthly with OADS. Director Wolcott suggested bi-monthly meetings, which Mr. Capron declined.[6] On April 2 Mr. Capron sent an email to Deputy Commissioner Hamilton (DHHS 000470-71; Capron 61) stating that based on his disability – specifically involving his memory retention and anxiety issues – he was asking for monthly meetings with OADS, which he characterized as one of several reasonable accommodations. Another accommodation he requested was to receive a written followup of all future meetings, which he said had been agreed at an early meeting with DHHS staff, to ascertain that both parties had heard the same message. Although Deputy Commissioner Hamilton had complained that he had been sending too many emails, Mr. Capron stated he needed to keep sending emails on issues as they arose. As a final reasonable accommodation, Mr. Capron

---

[5] Plaintiff's Statement of Additional Material Facts ¶ 89.

[6] In his affidavit, Wolcott says bi-monthly meetings were offered as a courtesy at that time.

8

requested written acknowledgment of any emails he sent.

Deputy Commissioner Hamilton forwarded Mr. Capron's request for accommodations to Kate Wentworth, the DHHS EEO Coordinator responsible for ADA issues. On April 21, 2016 Ms. Wentworth wrote to Mr. Capron offering him the option of emailing his concerns or questions to the Department through Scott Perkins, the Department's Constituent Services Coordinator, who would forward the concerns to appropriate personnel for resolution. Ms. Wentworth explained that Mr. Perkins would confirm receipt of Mr. Capron's communications and that Mr. Capron's questions and concerns would be reviewed by an appropriate team of professionals in the Department. Once appropriate Department personnel had the opportunity to review Mr. Capron's concerns, they would respond to Mr. Capron via email or letter.

In his opposition to the motion for summary judgment, Mr. Capron notes that his April 2 request sought monthly meetings with "OADS," not with Deputy Commissioner Hamilton or Director Wolcott specifically. However, several of Mr. Capron's requests were to meet or communicate directly with Hamilton or Wolcott. When Mr. Capron rejected Ms. Wentworth's proposal on May 1, he stated that "I need more direct and timely communications from subject matter experts at DHHS. That includes Ricker Hamilton, Gary Wolcott, Nick Adolphsen, Debra Halm and such." (DHHS 000530). Subsequently, on June 3, 2016, Mr. Capron emailed Deputy Commissioner Hamilton and Director Wolcott with copies to Ms. Wentworth and DHHS counsel Kevin Wells (DHHS 000581), stating, "I have not agreed to your proposed accommodations and do not intend to" but also stating that he needed "time with Ricker and with Gary" to address certain issues. That email also stated that he had filed a complaint with the Maine Human Rights Commission[7] and complained that he had not even gotten the bi-monthly meetings offered by

---

[7] It appears that a complaint was actually not filed with the MHRC until July 18.

9

Director Wolcott at the April 1 meeting.

Relations between DHHS and Mr. Capron deteriorated from there. By the end of June Mr. Capron was sending accusatory emails to Deputy Commissioner Hamilton telling him to step down and accusing him of lying and mismanagement, and Hamilton was declining to respond. (DHHS 000665, 000667).

DHHS has offered evidence that DHHS staff did not offer regular individual meetings on a monthly or bi-monthly schedule to clients, providers, or members of the general public during 2016 and that neither Deputy Commissioner Hamilton nor Director Wolcott met regularly with any one provider, organization, or constituent. Defendant's Rule 56(h)(1) Statement ¶¶ 23, 24. Mr. Capron disputes these assertions although most of the contrary evidence he offers is either inadmissible hearsay or his own unfounded conjecture. He has submitted one additional item of evidence – a DHHS announcement issued in June 2018 which stated that DHHS was changing its system of meeting with stakeholders. This document is not from the 2016 time period, and it is evident from the additional documents submitted by Mr. Capron that the stakeholder meetings referred to in the June 2018 announcement were not individual meetings with stakeholders but were group meetings open to stakeholders on a regional basis. Capron 323-25.

On July 18, 2016 Mr. Capron filed a complaint with the Maine Human Rights Commission alleging that DHHS had discriminated against him on the basis of his disability, including the claim that DHHS had not offered him the reasonable accommodations he had requested. On July 24, 2018 the MHRC dismissed his complaint, finding no reasonable grounds to believe that unlawful discrimination had occurred. Capron 339. Mr. Capron then commenced this action.

10

Mr. Capron contends the Department discriminated against him on the basis of his disability under both the MHRA and the ADA. Although he has asserted causes of action under five sections of the MHRA, the provisions of the MHRA that are pertinent to his claims are 5 M.R.S. § 4592(1)(B) and § 4592(1)(E). The former provides that unlawful discrimination includes "a failure to make reasonable modifications in policies, practices or procedures" when necessary to afford services or accommodations to individuals with disabilities. The latter provides that unlawful discrimination includes the exclusion of "a qualified individual with a disability, by reason of that disability . . . from participation in or being denied the services, programs, or activities of a public entity . . . "

The ADA in turn provides in almost identical language that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Regulations under the ADA further provide that public entities "shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7).[8]

For purposes of its motion for summary judgment, DHHS does not dispute that Mr. Capron is a qualified individual with a disability. Accordingly, the first issue in this case is whether

---

[8] In this case the term "reasonable accommodation," derived from regulations under the Rehabilitation Act, 29 U.S.C § 794, has been used by the parties rather than "reasonable modification." There is no material difference between the terms. *Nunes v. Massachusetts Dept. of Corrections,* 766 F.3d 138, 154 n.6 (1st Cir 2014).

11

meetings with officials of DHHS or OADS, as requested by Mr. Capron, constitute a "service, program, or activity" of DHHS as a public entity. Neither Mr. Capron nor MemoryWorks receives direct services from DHHS nor do they qualify as providers.[9] However, the scope of "services, programs, and activities" has been broadly construed. *See Geness v. Admin. Office of Pa. Courts*, 974 F.3d 263, 277 (3d Cir. 2020). At a minimum, Mr. Capron falls within the category of an interested party – a stakeholder if you will – with respect to the activities of the Department regarding the elderly and persons with dementia. DHHS interacts with stakeholders, and DHHS does not contend that it could choose to deny a person the status of a stakeholder because that person was disabled.

However, DHHS has offered evidence that it did not offer regular individual meetings with stakeholders. The ADA generally requires proof that a disabled person has been denied some benefit that a public entity *has extended to nondisabled people . . . ." Disability Rights N.J., Inc. v. Commissioner, N.J. Department of Human Services*, 796 F.3d 293, 306 (3d Cir. 2015) (emphasis added). In this case Mr. Capron has not demonstrated that the regular individual meetings he sought were available to other parties.

More importantly, DHHS has offered evidence that it declined Mr. Capron's requests for regular individual meetings because it concluded that such meetings were not necessary for either Mr. Capron or for the Department. Defendant's Rule 56(h)(1) Statement ¶¶ 22, 32. Nowhere in Mr. Capron's opposition to the Department's motion does he offer evidence supporting his claim that regular individual meetings with OADS – as opposed to the email responses offered by DHHS – were needed to address the memory retention and anxiety limitations that he cited as resulting

---

[9] Although Mr. Capron has inquired whether MemoryWorks could qualify as a respite care provider or receive grants, he does not allege that he or MemoryWorks have wrongfully been denied provider status or have wrongfully been denied any grants.

12

from his disability. The court takes no position on whether the various criticisms of OADS made by Mr. Capron were valid or invalid. However, the record demonstrates that the primary reason Mr. Capron requested meetings is that he wanted to be able to convey those criticisms and his other views -- in many instances to Deputy Commissioner Hamilton and other high-ranking officials -- in person. The record demonstrates that Mr. Capron was fully capable of forcefully and cogently expressing his views in the emails he sent to the Department and in responding to the emails he received from the Department. To the extent that he may have believed his views and criticisms would have greater effect if delivered in person, that is not a reason that was based on any need to accommodate his disability.

To resist a motion for summary judgment, a plaintiff must establish at least a prima facie case for every element of his case that is challenged on a motion for summary judgment. *See, e.g., Corey v. Norman Hanson & DeTroy,* 1999 ME 196 ¶ 9, 742 A.2d 933. In this case Mr. Capron has not demonstrated that there is a genuine issue for trial on whether the meetings he requested were needed to assist him in overcoming any limitations imposed by his disability.

In this connection, Mr. Capron's request for regular individual meetings is the controlling issue. If he has not shown that such meetings were needed as a reasonable accommodation to avoid discrimination against him on the basis of his disability, his request for written followup memorializing such meetings is moot. Moreover, Ms. Wentworth's April 21 letter contemplated that Mr. Capron could continue emailing to DHHS as he saw fit, and she agreed to his requested accommodation that each email be acknowledged.

In sum, considering the evidence in the summary judgment record in the light most favorable to Mr. Capron, the court nevertheless concludes that the Department's motion for summary judgment should be granted.

13

The entry shall be:

The motion for summary judgment by defendant DHHS is granted and plaintiff's complaint is dismissed. The clerk is directed to incorporate this order in the docket by reference pursuant to Rule 79(a).


Dated: February 18, 2021

Thomas D. Warren
Justice, Superior Court


Entered on the Docket: 02/19/21


**Plaintiff–Kenneth A Capron (Pro Se)**
**Defendant–Kelly Morrell, AAG**

14

STATE OF MAINE
CUMBERLAND, ss

SUPERIOR COURT
CIVIL ACTION
DOCKET NO. CV-18-470

KENNETH CAPRON, et al.,

      Plaintiffs

v.

                                             ORDER

MAINE DEPARTMENT OF HEALTH
AND HUMAN SERVICES,

REC'D CUMB CLERKS OFC
JAN 29 '20 PM1:57

      Defendant

This will confirm and supplement rulings at a discovery conference on the record that was held in the above-captioned case on January 27, 2020.

1. Counsel for DHHS has searched for any emails relating or referring to Kenneth Capron in the accounts of certain DHHS employees and has agreed to search in the email accounts of Wentworth and Halm for the period January 1, 2016 until July 18, 2016 (the date the MHRC complaint was filed).

2. Counsel for DHHS shall also search the email accounts of Perkins, Lawrence, Hamilton, Pomelow, and Malinowski for any communications relating or referring to Kenneth Capron during the period from January 1, 2016 to July 18, 2016.[1] Plaintiff stated at the conference that he had received some emails to or from Kevin Wells, and while communications to and from Wells would be subject to work product privilege from July 18, 2016 onward, a search should be made through his emails from January 1, 2016 to July 18, 2016 if one has not been undertaken previously.

---

[1] Plaintiff agreed at the conference that this was the crucial period with respect to the accommodations that he contends were wrongly denied.

Plaintiff-Pro Se
Defendant-Kelly Morrell, Esq.

3. The court understands that plaintiff agreed at the conference that he is not seeking a search through the emails of any of the other individuals mentioned at the conference with the exception of Merchant and Turyn, However, any search relating to Merchant and Turyn depends on whether plaintiff is entitled to litigate matters that occurred prior to September 21, 2015. See ¶ 8 below. The court reserves decision on that issue at this time.

4. In addition to responsive emails, counsel for DHHS shall also search for and produce any documents or notes other than emails relating or referring to Kenneth Capron from January 1, 2016 to July 18, 2016. This shall include but is not limited to any documents, notes, or minutes of (a) the meeting that occurred with Capron on April 1, 2016; (b) the April 22 meeting "re: Ken Capron" that is referred to in plaintiff's second request for production of documents; and (c) any other meeting relating to plaintiff's request for an accommodation on the basis of disability.

5. Counsel for DHHS shall search for and produce any daily meeting schedules that exist for Hamilton for the period from June 1, 2015 to July 18, 2016. Plaintiff believes such schedules were created by Lawrence.

6. As stated at the conference, the work product privilege would apply to litigation before the Maine Human Rights Commission. Although there was discussion at the conference of whether work product may be asserted for notes or communications if they are not prepared by or sent to an attorney, Rule 26(b)(3) refers to documents prepared in anticipation of litigation "by or for a party" as well as by or for a party's representative. *See Springfield Terminal Railway Co. v. MDOT,* 2000 ME 126 ¶ 18, 754 A.2d 353. Accordingly, the court will agree that DHHS is entitled to assert work product privilege with respect to communications among its employees as well as with attorneys beginning on July 18, 2016, when the MHRC complaint was filed. All of

2

the events that are the subject of plaintiff's complaint occurred prior to his MHRC filing. The court will not engage in an in camera review of the documents for which work product privilege has been claimed unless plaintiff can demonstrate some basis for a belief that the work product privilege may not apply to some or all of the documents on the privilege log.[2]

7. If the current DHHS policies relating to non-discrimination and reasonable accommodations for persons with disabilities were not in effect during the period from January 1, 2016 through July 18, 2016, DHHS shall produce any policies that were in effect at that time. This should include any policies that would be applicable to ordinary citizens or "constituents."

8. Plaintiff stated at the conference that he is not pursuing a retaliation claim, but he believes there is statutory authority for him to seek documents relating to alleged acts of discrimination that occurred prior to September 21, 2015 – during a period of time which would otherwise be outside the statute of limitations. The court agreed to allow plaintiff to provide the statutory authority for that argument, and he shall do so on or before February 7, 2020 (with an emailed copy to counsel for DHHS). Counsel for DHHS shall have until February 14 to respond.

9. However, the court has reviewed the file and plaintiff's pleadings and concludes that there are two areas where a search should in any event be conducted for documents and emails prior to September 21, 2015. This is because the documents in question arguably relate to the reasons or alleged reasons for the DHHS actions in April 2016 that are the subject of plaintiff's complaint.

10. Accordingly, whether or not plaintiff may otherwise litigate events that took place prior to September 21, 2015, counsel for DHHS shall search for and produce any documents or emails that relate to the reference in a March 2014 MEDCAPS report to an individual "who was

_____

[2] All of the documents on the privilege log post-date the MHRC filing.

3

so outspoken, opinionated and divisive that some individuals asked to be removed from the stakeholder list." This shall include any documents relating or referring to the allegedly divisive behavior and any documents relating or referring to what the March 2014 report refers to as a response of channeling all communications through Office Directors and ending monthly stakeholder meetings.

11. In addition, without limitation to the period from September 21, 2015 to July 18, 2016, counsel for DHHS shall produce any documents or emails (if not already produced) that relate to the statement in Hamilton's January 1, 2016 email that prior responses to Plaintiff's emails "have not been effective," including the prior responses to which Hamilton was referring.

12. The above rulings address the Rule 26(g) issues arising from defendant's response to plaintiff's first request for production and certain of the follow-up requests contained in plaintiff's untimely second request for production. Otherwise DHHS need not respond to plaintiff's second request because plaintiff waited to serve it until 9 or 10 days before the then existing discovery deadline, because the requests not included in the rulings above do not appear to be reasonably calculated to lead to discovery of relevant and admissible evidence, and because the court understands that plaintiff is not pursuing many of those requests.

13. The discovery deadline is extended to February 26, 2020 solely for the purpose of the discovery set forth above. The parties shall have 30 days after the discovery deadline in which to file any dispositive motions.

14. Plaintiff has moved to amend his complaint solely to add a request for civil penal damages under 14 M.R.S. § 4613(2)(B)(7). Civil penal damages, unlike compensatory damages, would not generate additional issues for trial or convert this action into one where a trial by jury might be demanded. *See Falmouth v. Long,* 578 A.2d 1168, 1171-72 (Me. 1990). In addition,

4

plaintiff is seeking attorney's fees but as a pro se litigant, he is likely not entitled to attorney's fees. *See Kay v. Erler,* 499 U.S. 432, 435 & n.5 (1991). As a result, the court will grant the motion to amend. The court retains the discretion to determine the amount of any civil penal damages to assess – if plaintiff prevails.

15. The Department may file an answer to the amended complaint if it chooses to do so on or before February 14, 2020. Because the amended complaint contains no new factual allegations, however, the Department's existing answer shall apply to the amended complaint if the Department does not file a separate answer to the amended complaint.

The entry shall be:

1. Discovery order entered.

2. Discovery deadline extended to February 26, 2020 for the discovery referred to in this order. The parties shall have 30 days after the discovery deadline in which to file any dispositive motions.

3. Plaintiff's motion to amend is granted.

4. The Clerk is directed to incorporate this order in the docket by reference pursuant to Rule 79(a).

Dated: January 28, 2020

Thomas D. Warren
Justice, Superior Court

Entered on the Docket 01/30/20

5